552 S.E.2d 712

Richard Anthony TUCKER, Petitioner,

v.

William CATOE, Director, South Carolina Dep't of Corrections, and Charles M. Condon, Attorney General of South Carolina, Respondents.

No. 25332.

Supreme Court of South Carolina.

Heard June 7, 2001

Decided July 23, 2001.

Thomas R. Haggard, of Ridgeway, and Teresa L. Norris, of Columbia, for petitioner.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, and Assistant Deputy Attorney General Donald J. Zelenka, of Columbia, for respondents.

PER CURIAM:

This matter is before the Court on a *Butler*[1] petition for a writ of habeas corpus. Petitioner, now on death row,[2] contends that errors in his capital sentencing proceeding warrant this Court's exercise of the writ. We find that the *Allen*[3] charge given to petitioner's sentencing jury was unconstitutionally coercive and "in the setting, constitute[d] a denial of fundamental fairness shocking to the universal sense of justice." *Butler v. State*, 302 S.C. 466, 468, 397 S.E.2d 87, 88 (1990). Accordingly, we grant the writ and remand for a new sentencing proceeding.

## A. *Facts*

We have adopted, with minor modifications, the findings of fact[4] made by the state post-conviction relief (PCR) judge:

- The jury begins sentencing deliberations at 1:33 p.m. on October 27, 1993.
- At 5:02 p.m., the jury returns with this question: "In the event of a decision for a life sentence—what is the possibility of parole, if any," and the trial court responds: Whether or not the defendant would or would not be eligible for parole should not enter into your deliberations or factor into your decision. The terms a death sentence and a life imprisonment sentence are to be understood in their plain and ordinary meaning.
- Sometime between 5:03 p.m. and 5:55 p.m., the jury returns with a second note: "We are deadlocked at 10–2 for the death penalty. We are not making any further progress. We would like to hear [petitioner's] testimony, and then continue our deliberation until 10:00 PM—unless we reach a verdict before then." The trial judge does not read this note to counsel; he does tell counsel that the

---

1. *Butler v. State*, 302 S.C. 466, 397 S.E.2d 87 (1990).

2. See *State v. Tucker*, 319 S.C. 425, 462 S.E.2d 263 (1995).

3. *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

4. These facts also appear in the Fourth Circuit's opinion denying petitioner federal habeas relief. *Tucker v. Catoe*, 221 F.3d 600 (4th Cir.) cert. denied, 531 U.S. 1054, 121 S.Ct. 661, 148 L.Ed.2d 563 (2000).

jury wanted to rehear testimony. The jury declines the judge's offer to order dinner, preferring to wait until after the testimony is replayed. Testimony is then replayed over the next hour, and the jury retires to deliberate at 6:53 p.m.

- Around 8:03 p.m., the jury sends another note: "We are not going to reach a decision tonight. We would like to go back to the motel and resume deliberations in the morning. (We can eat at the motel)." No party objects, and the jury is excused for the evening.

- The jury returns and begins deliberations the next day at 9:00 a.m. Around 10:44 a.m., the jury sends another note: "We are hopelessly deadlocked at 11–1 for the death penalty. I do not feel we will ever get an[sic] unanimous decision." Again, the trial court does not read the note in court although the judge informs the parties that he intends "to bring them back in to inquire and perhaps to give them additional instruction." The attorneys are made aware only that the vote is 11–1; no mention is made of "hopelessly deadlocked." Petitioner's counsel then objects:

Well, let met [sic] state that I know that the Court is going to give additional instructions. Prior to anything that would be either a watered-down version of an *Allen* charge, we would ask that the Court inquire as to whether or not in the jury's opinion they feel that they are hopelessly deadlocked. Additionally, we would further submit that if the Court gives a charge that would be, again, a watered-down *Allen* charge we would also request that the Court instruct the jury that other consequences of not reaching a decision in a death-penalty case dealing specifically with the penalty phase, that the defendant would receive life imprisonment. Our authority is based primarily on some Florida cases. I can cite those to you, but that basically would be our position on that.

The trial court then gives this charge:

Good morning, ladies and gentlemen. I understand from a note handed up by way of the bailiff that apparently came from the foreman, is [sic] that you are having some difficulty in arriving at a unanimous decision. I intend to give you

a little further instruction, and then I am going to ask you to go back to the jury room to continue for some time with your deliberations.

Now, as I told you in the beginning of the trial, you are the sole judges of the facts in the case and I am the judge of the law in this case. I am not permitted to in any fashion give you a hint as to how I feel about the verdict or how the case should be decided. That is not my decision; that is not my purpose.

It is your decision as to the appropriate sentence that should be imposed in this particular case based upon your view of the evidence as well as the application of the law; but I can say that when a matter is in dispute it isn't always easy for even two persons to agree, and when 12 men and women must agree as to a particular decision, it becomes correspondingly more difficult, but it's important that jurors reach a unanimous verdict if that may be accomplished without a juror doing violence to his or her own conscience. At the same time no juror is expected to give up an opinion based on reasoning satisfactory to himself or herself merely for the purpose of being in agreement with others.

It was never intended that the verdict of the jury should be the view of any one person. On the other hand, the verdict of the jury is the collective reasoning of all of the men and women serving on the panel. That's why we have a jury, so that we have the benefit of collective thought and of collective reasoning.

Now, it becomes each of your duties as jurors to tell the other jurors how you feel about the case and why you think as you do. It becomes each of your duties to exchange views with the other jurors, and you should listen to each other and give to the other's thought such meaning as you think it should have.

So, ladies and gentlemen, at this time I am going to ask you to consider that further instruction. Go back into the jury room and continue your deliberations and see if you can arrive at a unanimous verdict.

Petitioner's counsel then objects again:

Your Honor, on the specific charge and on the *Allen* charge in and of itself, I object to the entire charge, per se. It's

the very nature of an *Allen* charge outside of public policy, that it helps avoid the cost of another trial which would not be applicable here.

The very nature of any sort of an *Allen* charge is coercive in nature. It is our position particularly at paragraph number—the third paragraph referred to by the Court is, in effect—it could be interpreted as singling out either one or two jurors and could lead to some coerciveness inside the deliberations.

It could be interpreted by a juror that that juror has to switch over because of a particular charge. So we would object to the charge in toto as being coercive, and just renew again our request that they be given further instruction as to the consequences of not being able to reach a unanimous verdict. That would be it.

- At 12:27 p.m., the jury returns a unanimous recommendation of death.

## B.  *Procedural History*

Petitioner's trial attorney asked that the jury be informed of the consequences of its inability to reach a sentencing decision. Following the *Allen* charge, which did not include a "consequences" charge, the trial attorney objected to the *Allen* charge as coercive "in toto" and "per se," and objected that the charge could be interpreted as singling out the minority juror. On direct appeal, petitioner argued (1) that the trial judge should have instructed the jury not to reveal its vote and (2) that the *Allen* charge was improper because the judge knew there was only one juror holding out. *State v. Tucker*, 319 S.C. at 427–28, 462 S.E.2d at 264–65. We found these claims procedurally barred because petitioner was improperly altering the grounds raised at trial on appeal. *Id.* at 428, 462 S.E.2d at 265.[5]

---

5.  Inexplicably, the Fourth Circuit concluded that we erred in finding procedural defaults in the *Allen* charge issues. *Tucker v. Catoe*, supra. Even petitioner's direct appeal counsel testified at the PCR hearing that he intentionally "blurred" the trial objections in hopes of presenting a more persuasive argument on appeal. The procedural bar ruling was a routine application of state law; we do not understand the Fourth Circuit's gratuitous comments.

At the PCR proceeding, petitioner claimed appellate counsel was constitutionally ineffective in altering the *Allen* charge argument. Appellate counsel acknowledged he had deliberately "blurred" the issues because his research convinced him that the objection at trial would not succeed on appeal. The PCR judge found no constitutional deprivation since appellate counsel has no duty to raise every non-frivolous issue, and must be allowed to exercise his reasonable professional judgment. *Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *Thrift v. State,* 302 S.C. 535, 397 S.E.2d 523 (1990). We denied certiorari.

As the foregoing demonstrates, this Court has never addressed petitioner's allegation that the *Allen* charge was unconstitutionally coercive on the merits. Further, we consider for the first time petitioner's claim that his jury engaged in "reasonable deliberation" as a matter of law, thereby requiring the trial judge to direct a life sentence pursuant to S.C.Code Ann. § 16-3-20(C) (Supp.2000).[6]

In keeping with our policy of not reaching constitutional issues unless necessary to the solution of the case, we first discuss petitioner's statutory claim. E.g., *Fairway Ford, Inc. v. County of Greenville,* 324 S.C. 84, 476 S.E.2d 490 (1996).

### C. *Reasonable Deliberation*

■ The interpretation of § 16-3-20(C)'s instruction that the trial judge impose a life sentence if a capital sentencing jury cannot reach a recommendation after a "reasonable deliberation" presents a novel question. While "reasonable deliberation" is something less than the "due and thorough deliberation" standard of our "two return" statute,[7] we hold that the determination whether a particular jury has met such a standard is a matter committed to the trial judge's discretion. See, e.g., *Buff v. South Carolina Dep't of Transportation,* 342 S.C. 416, 537 S.E.2d 279 (2000) ("trial judge who is in the best

---

6. "If members of the jury after a **reasonable deliberation** cannot agree on a recommendation as to whether or not the death sentence should be imposed on a defendant ... the trial judge shall dismiss such jury and shall sentence the defendant to life imprisonment ...." (emphasis added).

7. S.C.Code Ann. § 14-7-1330 (1976).

position to observe the jury's demeanor should have some flexibility in guiding a case to its final resolution while protecting the parties' rights to a fair, impartial, and conscientious verdict").

■ The State contends that we should look at the time spent in face-to-face deliberations while petitioner contends we should look at the entire period. In our view, however, "reasonable deliberation" is not simply an elapsed-time dependent determination. In *State v. Atkins*, 303 S.C. 214, 399 S.E.2d 760 (1990), the Court held there was no error in requiring the re-sentencing jury to continue deliberating when it reported, after 3½ hours of deliberation, that it was "hung." The statutory "reasonable deliberation" issue was neither raised nor decided in *Atkins*, nor in *State v. Yates*, 280 S.C. 29, 310 S.E.2d 805 (1982), subsequent history omitted (judge sent jury back when it returned after 50 minutes and reported a deadlock; only appellate issue was whether it was error to refuse to charge effect of hung jury); see also *State v. Hughes*, 336 S.C. 585, 521 S.E.2d 500 (1999) (*Allen* charge given after four hours of deliberation was not coercive).

■ Here, a substantial period of time elapsed between the jury's beginning deliberations (1:33 p.m. on the 27th) and the time it informed the judge it was "hopelessly deadlocked" (10:44 a.m. on the 28th). Further, the evidence in the record demonstrates that petitioner's jury took its responsibility seriously, and that it was a jury working diligently to reach a verdict. Under these circumstances, had the issue been raised to him, the trial judge in his discretion may or may not have found the jury had engaged in a "reasonable deliberation." In order to grant relief on this ground we would be required to hold that, as a matter of law, this jury had done so. This we decline to do.

### D. *Coercive Allen Charge*

■ Neither the Due Process clause nor the Eighth Amendment forbid the giving of an *Allen* charge in the sentencing phase of a capital proceeding. *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); see also *Jones v. United States*, 527 U.S. 373, 119 S.Ct. 2090 (1999) (no constitutional requirement that capital jury be informed of

consequences of its failure to agree). Whether an *Allen* charge is unconstitutionally coercive must be judged "in its context and under all the circumstances." *Lowenfield*, supra. While recognizing the State's strong interest in having a jury determine the sentence, *Lowenfield* reaffirmed that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Id.* (internal citations omitted). The Court also noted that the societal costs of a retrial are not a factor in those cases where, as in South Carolina, the law provides for a life sentence if a capital sentencing jury hangs. *Id.*

*Lowenfield* is the definitive United States Supreme Court decision on the constitutionality of an *Allen* charge in a capital sentencing proceeding. The test for determining whether a given charge is unconstitutionally coercive is very fact intensive. For that reason, we have discussed *Lowenfield* in some detail below.

After the jury convicted Lowenfield of two counts of manslaughter and three counts of murder, the initial charge in the sentencing phase admonished the jurors to consider the view of others with the object of reaching a verdict, but also instructed them not to give up their own honest beliefs in order to do so. The jury deliberated late into the night and resumed the next day. During that afternoon, the foreman sent a note that the jury was unable to reach a verdict at that time and asked for a recharge on the jurors' responsibilities. In response to the judge's inquiry, eleven of the jurors responded that further deliberations would probably allow them to reach a verdict. The trial judge charged the jury:

> When you enter the jury room it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgment.

> Each of you must decide the case for yourself but only after discussion and impartial consideration of the case with your fellow jurors. You are not advocates for one side or the other. Do not hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and

effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Thirty minutes later, the jury returned a death sentence on all three murder counts.

In upholding the constitutionality of this charge, the Court considered:

(1) the charge did not speak specifically to the minority juror(s);

(2) the judge did not include in his charge any language such as "You have got to reach a decision in this case" [8];

(3) there was no inquiry into the jury's numerical division, which is generally coercive; and

(4) while the jury returned a verdict shortly after the supplemental charge, which suggests a possibility of coercion, weighing against this is the fact that trial counsel did not object either to the inquiry into whether the jurors believed further deliberation would result in a verdict, nor to the supplemental charge.

The *Lowenfield* court concluded:

We hold that on these facts the combination of the polling of the jury and the supplemental instruction was not "coercive" in such a way as to deny petitioner any constitutional right. By so holding we do not mean to be understood as saying other combinations of supplemental charges and polling might not require a different conclusion. Any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body.

■ *Lowenfield* sets the standard by which petitioner's constitutional claim is to be judged. We therefore apply the *Lowenfield* factors to petitioner's facts.

### 1. Did the charge speak specifically to minority jurors?

While these jurors were told that they should not do "violence to his or her own conscience" in order to reach a verdict, and not to give up an opinion "based on reasoning

---

**8.** *Jenkins v. United States*, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965).

satisfactory to himself or herself merely for the purpose of . . . agreement . . .", the jurors were also charged:

> [W]hen 12 men and women must agree as to a particular decision, it becomes correspondingly more difficult, but it's important that jurors reach a unanimous verdict. . . .
>
> It was never intended that the verdict of the jury should be the view of any one person. On the other hand, the verdict of the jury is the collective reasoning of all of the men and women serving on the panel. That's why we have a jury, so that we may have the benefit of collective thought and of collective reasoning.
>
> Now, it becomes each of your duties as jurors to tell the other jurors how you feel about the case and why you think as you do. It becomes each of your duties to exchange views with the other jurors, and you should listen to each other and give to the other's thought such meaning as you think it should have.

Viewed as a whole, this jury charge was directed to the minority juror. The trial judge knew, and apparently the jury knew that he knew, that while there had been two hold-out jurors as of 5 p.m. the night before, there was now only one. See *State v. Hughes,* supra (an even-handed admonition to minority and majority to give consideration to each others' views not coercive); *State v. Jones,* 320 S.C. 555, 466 S.E.2d 733 (Ct.App.1996) (viewed as a whole, *Allen* charge given when judge knew division was 11–1 not coercive where judge did not know alignment, urged dissenting jurors to consider whether their positions were unreasonable in light of majority's judgment, but told them the verdict must be juror's own, the result of his convictions, and not mere acquiescence in the others' conclusion).

2. "You must return a verdict" type language.

While no such mandatory language was used here, petitioner's jury was told of the importance of a unanimous verdict.

3. Inquiry into the jury's numerical division.

Petitioner's jury informed the trial judge of their numerical split, as well as their alignment, on the first evening. Not only did the judge fail to inform the attorneys of the note's

contents, he failed to instruct the jurors not to disclose their division in the future. Cf. *State v. Middleton*, 218 S.C. 452, 63 S.E.2d 163 (1951) (improper for judge to require the jury to publicly reveal the nature or extent of their division).

While the trial judge did not engage in polling the jury as to its division, a practice condemned in *Lowenfield*, supra and in *Brasfield v. United States*, 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345 (1926), he did not act to prevent the jury's self-reporting. In *Brasfield*, the Court held that "the inquiry into the jury's numerical division necessitated reversal because it was generally coercive and alwaysbrought to bear 'in some degree, serious although not measurable, an improper influence on the jury.'" *Lowenfield*, supra (internal citation omitted). The *Lowenfield* Court noted *Brasfield* was not a constitutional decision but rather a "supervisory powers" case. None-the-less, knowledge of the jury's numerical division combined with knowledge of its decisional disagreement, followed by an *Allen* charge directed, at least in part, to minority jurors, is impermissibly coercive. *Lowenfield*, supra.

4. Time of return of verdict.

Petitioner's jury returned the death sentence at 12:27 p.m., approximately an hour and a half after receiving the *Allen* charge. This is a relatively short period of time given the fact the dissenting juror had been holding out since at least 5 p.m. the day before. Further, petitioner's attorney, unlike Lowenfield's, did object to the *Allen* charge, and had no opportunity to object to the jury's revelation of its divisions. This factor weighs in favor of a finding of coercion.

Comparing this case with *Lowenfield*, we find petitioner's *Allen* charge unconstitutionally coercive. We agree with the Fourth Circuit's holding that "the import of the charge was that the single juror (whom every member of the jury knew was holding out) should not prevent the majority from imposing the death penalty" and that the charge was therefore impermissibly coercive under the totality of the circumstances. *Tucker v. Catoe*, 221 F.3d at 612. We hold that the *Allen* charge given in this case violated petitioner's due process rights.

■ This conclusion, however, does not end our *Butler* inquiry, for relief is appropriate only where the violation "in

the setting, constitutes a denial of fundamental fairness shocking to the universal sense of justice." *Butler v. State,* supra. We hold this standard has been met here.

Petitioner and his attorneys were denied a meaningful opportunity to protect petitioner's rights. The judge did not disclose the contents of the jury's first note, which revealed a 10–2 deadlock in favor of the death penalty, but rather told the attorneys only that the jury wished to rehear some testimony. When the jury sent a note the next day, the judge did inform the attorneys that the jury was divided 11–1, but again did not reveal that the jury was in favor of death, nor that the foreman had used the term "hopelessly deadlocked," nor that he had written "I do not feel we will ever get an unanimous verdict."

We find the combination of withholding pertinent information from the parties, thereby depriving them of the facts necessary to make informed decisions; failing to instruct the jury to omit from its future communication any reference to the nature of its division; and giving an unconstitutionally coercive *Allen* charge, with its emphasis on a collective result, shocking to the universal sense of justice. We emphasize that it is the combination of factors, in the setting, which compel us to grant petitioner a writ of habeas corpus and to order a new sentencing proceeding.

Writ granted.

TOAL, C.J., MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.