# The Supreme Court of South Carolina

The State, Petitioner,

v.

Richard Bill Niles, Jr., Respondent.

Appellate Case No. 2012-213592

## ORDER

The petition for rehearing is granted with respect to the request that footnote 11 be deleted. All other grounds for rehearing raised in the petition for rehearing are denied. The attached opinion is substituted for the previous opinion, which is withdrawn.

s/ Jean H. Toal        C.J.

s/ Donald W. Beatty       J.

s/ John W. Kittredge       J.

s/ Kaye G. Hearn        J.

I would grant the petition for rehearing in its entirety.

s/ Costa M. Pleicones      J.

Columbia, South Carolina
June 10, 2015

# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Petitioner,

v.

Richard Bill Niles, Jr., Respondent.

Appellate Case No. 2012-213592

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal From Horry County
Benjamin H. Culbertson, Circuit Court Judge

---

Opinion No. 27510
Heard June 25, 2014 – Refiled June 10, 2015

---

## REVERSED

---

Attorney General Alan McCrory Wilson, Chief Deputy
Attorney General John W. McIntosh, Senior Assistant
Deputy Attorney General Donald J. Zelenka, and
Assistant Attorney General Brendan Jackson McDonald,
all of Columbia, and Solicitor Jimmy A. Richardson II,
of Conway, for Petitioner.

Chief Appellate Defender Robert Michael Dudek, of
Columbia, and Reid T. Sherard, of Nelson Mullins Riley

& Scarborough, LLP, of Greenville, for Respondent.

**CHIEF JUSTICE TOAL:**    Richard Bill Niles, Jr. was convicted of murder, armed robbery, and possession of a weapon during the commission of a violent crime. The court of appeals reversed Respondent's murder conviction and remanded for a new trial, finding the trial court erred in refusing to instruct the jury on the lesser-included offense of voluntary manslaughter. *State v. Niles*, 400 S.C. 527, 735 S.E.2d 240 (Ct. App. 2012).[1]  We reverse.

### FACTS/PROCEDURAL BACKGROUND

This case arises from the shooting death of James Salter (the victim) in a Best Buy parking lot in Myrtle Beach.  It is undisputed that Niles, his fiancé, Mokeia Hammond, and Ervin Moore met the victim at the parking lot to purchase marijuana from him.[2]  Niles and Moore testified at trial,[3] and Niles's version of events matched Moore's version, except as to whose idea it was to rob the victim and whether Niles or the victim fired the first shots.[4]  Thus, the evidence at trial focused on whether Niles was the aggressor in the deadly encounter.

On the afternoon of April 9, 2007, Niles and Hammond encountered Moore at a convenience store in Trio, South Carolina, and invited Moore to accompany them to Myrtle Beach.  Niles and Moore were acquaintances, having known each other through various family members.  On the way to Myrtle Beach, the trio smoked all of the marijuana that they had brought with them.

---

[1] Niles did not appeal his convictions for the remaining offenses. *Niles*, 400 S.C. at 531 n.1, 735 S.E.2d at 242 n.1.

[2] Hammond and Moore were also charged with murder, armed robbery, and possession of a firearm during the commission of a violent crime. Moore entered into a plea agreement with the State, whereby he pleaded guilty to voluntary manslaughter, armed robbery, and possession of a firearm during the commission of a violent crime in exchange for his testimony against Niles and Hammond at their joint trial.

[3] Hammond chose not to testify in her defense.

[4] Niles admitted he shot the victim and that Moore and Hammond were unarmed.

Therefore, Niles contacted the victim[5] via telephone and arranged to meet him at the Best Buy parking lot to purchase marijuana. Niles testified that his conversation with the victim had a dual purpose. Not only was he meeting with the victim so that Moore could purchase a pound of marijuana from him, but he claimed that the victim owed him $5,000 as payment for other drug transactions. According to Moore, however, Niles subsequently decided to rob the victim instead.[6]

Once in Myrtle Beach, the trio made several stops at various motels so that Niles could sell crack cocaine before meeting the victim at the designated meeting spot at approximately 7:00 p.m. Hammond was driving Niles's rental vehicle, with Niles riding in the front passenger's seat and Moore riding in the back seat. Hammond parked the rental vehicle next to the victim's vehicle. Moore testified that his role in the robbery was "to identify the weed" for Niles. Therefore, Moore approached the victim's vehicle first. Moore joined the victim in the victim's vehicle, and the victim produced the bag of marijuana for Moore to inspect.

Moore testified that as he returned to Niles's vehicle, Niles had already exited his vehicle, and Moore told Niles that the victim had the drugs. Moore testified that as he returned to his place in Niles's vehicle, Niles was leaning inside the passenger-side door of the victim's vehicle and was speaking to the victim.[7]

Moore testified he heard two shots and saw Niles leap into the back seat of his vehicle behind Hammond.[8] Moore then heard the victim fire a weapon in

[5] While Niles testified that he and the victim did not know each other personally, they had engaged in drug transactions for the past six to nine months. Niles testified he knew the victim by his nickname, "Spice," and that the victim knew him by his nickname, "Rich Boy." Niles testified that he and the victim were "in the business of selling drugs."

[6] Niles, on the other hand, testified that it was Moore's decision to rob the victim, and he did so without warning Niles beforehand.

[7] Niles's fingerprints were found on the victim's vehicle near where Niles was allegedly standing, corroborating Moore's testimony.

[8] Other witnesses to the shooting testified that they saw a "heavyset" black male running from the victim's car back to a dark sedan, which the State argued closely matched Niles's description, as Moore had a much smaller build than Niles.

response.  Niles and the victim shot back and forth multiple times.  Niles had the drugs with him that Niles had stolen from the victim.

In contrast, Niles testified that Moore acted alone.  Niles stated he merely set up the meeting, but Moore went over to the victim's vehicle to purchase the drugs while Niles and Hammond sat in the car and discussed their upcoming wedding.  Niles said he then saw Moore and the victim fighting in the victim's vehicle, and realized that Moore was robbing the victim.  Niles testified that Moore exited the victim's vehicle with the stolen drugs, and as Moore dove back into Niles's vehicle, Niles saw the victim draw his gun and shoot at them, knocking out the rear windows of Niles's vehicle.  Therefore, Niles grabbed his gun, and returned fire.  According to Niles, he was concerned with stopping the shooter and for Hammond's safety:

> So, while he was shooting in the car . . . I grabbed my pistol and that's when I shot two times. My eyes were closed. I wasn't even looking. I shot two times. I went pow, pow. I wasn't trying to hit nobody . . . I was just trying to get him to stop shooting. That's all I was trying to do. I didn't know if my fiancé got shot or nothing. That's the first thing that came to my head, you know.

After the shooting, Niles instructed Hammond to drive away from the scene, and the trio abandoned the vehicle at a nearby trailer park.  Niles then called a taxicab to transport him and Hammond to a local motel.  At that point, he and Hammond parted ways with Moore, and Moore kept the marijuana.  The victim died at the scene from a gunshot wound.

On these facts, the trial court instructed the jury on the law of murder and self-defense, but refused Niles's request to instruct the jury on voluntary manslaughter, reasoning that the evidence showed Niles was either guilty of murder or he was not guilty of any crime based on his claim of self-defense.

The court of appeals reversed Niles's murder conviction and remanded the case for a new trial, finding the evidence compelled a jury instruction on the lesser-included offense of voluntary manslaughter.  *Niles*, 400 S.C. at 534, 735 S.E.2d at 244.  Specifically, the court of appeals found there was evidence of sufficient legal provocation based on Niles's testimony that he shot at the victim only after the victim began shooting first.  *Id.* at 535, 735 S.E.2d at 244.  Further, the court of appeals found that there was evidence that Niles acted in a sudden heat of passion

based on Niles's testimony that he took Moore to meet the victim to buy marijuana; that Moore, without warning, decided to rob the victim; and that Niles did not fire his gun until after Moore perpetrated the robbery and the victim shot first. *Id.* at 536, 735 S.E.2d at 245. Therefore, the court of appeals concluded that there was evidence that Niles did not have an opportunity for cool reflection, and as such, there was evidence Niles acted in a sudden heat of passion. *Id.*

We granted the State's petition for a writ of certiorari to consider the State's argument that the court of appeals erred in determining Niles was entitled to a jury instruction on voluntary manslaughter because there was no evidence at trial that Niles acted in the sudden heat of passion.[9]

## STANDARD OF REVIEW

In criminal cases, the appellate court sits to review errors of law only. *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). Thus, this Court is bound by the trial court's factual findings unless the appellant can demonstrate that the trial court's conclusions either lack evidentiary support or are controlled by an error of law. *State v. Laney*, 367 S.C. 639, 644, 627 S.E.2d 726, 729 (2006). "The refusal to grant a requested jury charge that states a sound principle of law applicable to the case at hand is an error of law." *State v. Pittman*, 373 S.C. 527, 570, 647 S.E.2d 144, 167 (2007).

## ANALYSIS

The State maintains the trial court did not err in refusing Niles's request for an instruction on voluntary manslaughter because Niles failed to present evidence that he acted in the sudden heat of passion. We agree with the State that there was no evidence that Niles acted within a sudden heat of passion upon sufficient legal provocation, and therefore the trial court did not err in refusing to instruct the jury on the lesser-included offense of voluntary manslaughter.

"The law to be charged to the jury is determined by the evidence presented at trial." *State v. Hill*, 315 S.C. 260, 262, 433 S.E.2d 848, 849 (1993). The trial court is required to charge a jury on a lesser-included offense if there is evidence from which it could be inferred that the defendant committed the lesser, rather than

---

[9] We note that the State has not challenged the court of appeals' finding that there was evidence of sufficient legal provocation.

the greater, offense. *State v. Drafts*, 288 S.C. 30, 340 S.E.2d 784 (1986); *Dempsey v. State*, 363 S.C. 365, 610 S.E.2d 812 (2005). When determining whether the evidence requires a charge on voluntary manslaughter, the court must view the facts in the light most favorable to the defendant. *Pittman*, 373 S.C. at 572–73, 647 S.E.2d at 168.

"Voluntary manslaughter is the intentional and unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation." *State v. Smith*, 391 S.C. 408, 412–13, 706 S.E.2d 12, 14 (2011). To receive a voluntary manslaughter charge, there must be evidence of sufficient legal provocation and sudden heat of passion. *State v. Cole*, 338 S.C. 97, 101, 525 S.E.2d 511, 513 (2000).

> The sudden heat of passion, upon sufficient legal provocation, which mitigates a felonious killing to manslaughter, while it need not dethrone reason entirely, or shut out knowledge and volition, must be such as would naturally disturb the sway of reason, and render the mind of an ordinary person incapable of cool reflection, and produce what, according to human experience, may be called an uncontrollable impulse to do violence.

*State v. Walker*, 324 S.C. 257, 260, 478 S.E.2d 280, 281 (1996). Whether or not the facts constitute a sudden heat of passion is an appropriate question for the court. *State v. Hernandez*, 386 S.C. 655, 662, 690 S.E.2d 582, 586 (Ct. App. 2010) (citation omitted).

Niles's own testimony does not establish that he was overtaken by a sudden heat of passion such that he had an *uncontrollable impulse to do violence*. Rather, Niles testified that he did not want to hurt the victim; that he shot with his eyes closed; that he was merely attempting to stop the victim from shooting; and that when he shot his gun, he was thinking of Hammond rather than of perpetrating violence upon the victim. *See Cole*, 338 S.C. at 102, 525 S.E.2d at 513 ("[T]here was no evidence presented that Appellant was overcome by a sudden heat of passion as would produce an 'uncontrollable impulse to do violence.' On the contrary, by Appellant's own testimony, he shot at the men to scare them away. Appellant's testimony appears designed to support a charge of self[-]defense, not heat of passion."). As in *Cole*, the focus of Niles's testimony at trial was on who was the aggressor—Niles or the victim—apparently to support Niles's theory of self-defense. In *State v. Childers*, we explained:

Voluntary manslaughter, by definition, requires a criminal intent to do harm to another. But according to the defendant's story, he had no criminal intent whatsoever.

If, as he suggests, the defendant returned fire in a panic for his life, surely the defense of self-defense would be appropriate. Notably, this was charged by the trial court . . . . Without any evidence supporting the view that the defendant fired the fatal shots while under an "uncontrollable impulse to do violence," the trial court properly declined to charge the law of voluntary manslaughter to the jury.

373 S.C. 367, 375–76, 645 S.E.2d 233, 237 (2007). Because Niles, by his own testimony, lacked the intent to harm the victim, we cannot see how a voluntary manslaughter charge would have been appropriate under these facts.[10]

We note further that it was undisputed that Niles, Hammond, and Moore met the victim in the parking lot to rob the victim during the drug transaction. Niles further admitted that Moore and Hammond were unarmed, and that he fired the fatal shots, killing the victim. Thus, the scheme to rob the victim, coupled with Niles's decision to arrive at the scene armed with a deadly weapon, discounts any claim that Niles in any way act in a sudden heat of passion. Rather, Niles clearly planned for the possibility that he might have to discharge his weapon to accomplish the robbery, and did in fact kill the victim. These salient facts cannot be ignored. *See Pittman*, 373 S.C. at 575, 647 S.E.2d at 169 ("In determining whether an act which caused death was impelled by heat of passion or by malice, all the surrounding circumstances and conditions are to be taken into consideration, including previous relations and conditions connected with the tragedy, as well as those existing at the time of the killing." (citation omitted)). In other words, there was nothing *sudden* about Niles's decision to shoot the victim.[11]

---

[10] Undeniably, murder, self-defense, and voluntary manslaughter may coexist under the right factual circumstances; here, however, Niles's testimony went to the elements of self-defense, not voluntary manslaughter.

[11] Along the same lines, while the State has not challenged the court of appeals' findings with respect to sufficient legal provocation, we note that sufficient legal provocation cannot be found to exist where the victim is defending himself from a crime. *See State v. Knoten*, 347 S.C. 296, 314, 555 S.E.2d 391, 400 (2001)

Thus, we hold that the evidence did not warrant a voluntary manslaughter charge. *See State v. Smith*, 315 S.C. 547, 549, 446 S.E.2d 411, 412–13 (1994) ("The trial court may and should refuse to charge on a lesser-included offense where there is no evidence that the defendant committed the lesser rather than the greater offense.").

## CONCLUSION

For the foregoing reasons, we reverse the court of appeals.

**REVERSED.**

**BEATTY, KITTREDGE and HEARN, JJ., concur. PLEICONES, J., dissenting in a separate opinion.**

---

(Burnett, J., dissenting) ("A victim's attempts to resist or defend herself from a crime cannot satisfy the sufficient legal provocation element of voluntary manslaughter." (citing *State v. Shuler*, 344 S.C. 604, 545 S.E.2d 805 (2001)).

**JUSTICE PLEICONES:** I respectfully dissent. In my opinion, the court of appeals was correct in its holding that there is evidence in the record entitling Niles to a charge on voluntary manslaughter.

If there is any evidence to support a jury charge, the trial judge should grant the request. *State v. Shuler,* 344 S.C. 604, 632, 545 S.E.2d 805, 819 (2001). "To warrant the court in eliminating the offense of manslaughter it should very clearly appear that there is no evidence whatsoever tending to reduce the crime from murder to manslaughter." *State v. Wharton,* 381 S.C. 209, 214, 672 S.E.2d 786, 788 (2009). Voluntary manslaughter is the unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation. *State v. Smith*, 391 S.C. 408, 412-413, 706 S.E.2d 12, 14 (2011). The sudden heat of passion needed to justify a voluntary manslaughter charge must be such as would naturally disturb the sway of reason and render the mind of an ordinary person incapable of cool reflection and produce what may be called an uncontrollable impulse to do violence. *State v. Cole*, 338 S.C. 97, 101-102, 525 S.E.2d 511, 513 (2000).

In this case, a voluntary manslaughter charge should have been given if there were *any* evidence in the record from which a jury could infer that this killing was the result of sufficient legal provocation which caused Niles to experience an uncontrollable impulse to do violence. In my opinion, there is.

First, as the court of appeals noted, the unprovoked shooting by Salter amounted to evidence sufficient for a jury to infer that there was legal provocation. *See State v. Pittman*, 373 S.C. 527, 573, 647 S.E.2d 144, 168 (2008) ("This court has previously held than an overt, threatening act or a physical encounter may constitute sufficient legal provocation."). Second, I agree with the court of appeals that Niles's testimony that he immediately returned fire out of fear for himself and his fiancée provided evidence from which a jury could find that Niles was acting pursuant to an uncontrollable impulse to do violence. *State v. Wiggins*, 330 S.C. 538, 549, 500 S.E.2d 489, 495 (1998) (holding that the lower court properly charged the jury on voluntary manslaughter where defendant testified he was in fear of the threat of physical assault). Accordingly, I would affirm the court of appeals because I cannot say there is no evidence whatsoever tending to reduce this crime from murder to manslaughter.

Unlike the majority, I am unable to discern Niles' intent and state of mind on April 9, 2007, and to resolve numerous factual issues much as a jury might have done. For example, the majority states with certitude that Niles determined "to arrive at the scene armed with a deadly weapon," thus demonstrating he "clearly planned for

the possibility that he might have to discharge his weapon to accomplish the robbery . . . ."  In light of this premeditated decision, the majority states "there was nothing *sudden* about Niles' decision to shoot the victim."  In my opinion, the majority exceeds our scope of review in this law case by resolving disputed issues of fact in order to deny Niles a new trial.  *E.g.*, *State v. Sams*, 410 S.C. 303, 764 S.E.2d 511 (2014).

I would affirm the court of appeals.