**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

The State, Respondent,

v.

Lutavius Denard Elmore, Appellant.

Appellate Case No. 2020-001162

————————

Appeal From Laurens County
Donald B. Hocker, Circuit Court Judge

————————

Unpublished Opinion No. 2023-UP-307
Heard June 8, 2023 – Filed September 6, 2023

————————

**AFFIRMED**

————————

Appellate Defender Lara M. Caudy, of Columbia, for Appellant.

Attorney General Alan Wilson, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody J. Brown and Assistant Attorney General Tommy Evans, Jr., all of Columbia, and Solicitor David M. Stumbo, of Greenwood, all for Respondent.

————————

**PER CURIAM:** In the first trial held in the court of general sessions after the Covid-19 pandemic, the jury found Lutavious Denard Elmore guilty of murder, first degree burglary, and possession of a weapon during the commission of a violent crime. Elmore appeals, arguing the trial court erred by placing undue emphasis on the "importance" of the trial and by refusing to charge the jury on voluntary manslaughter. We affirm.

## FACTS/PROCEDURAL HISTORY

Elmore's trial was held August 3–11, 2020. Before jury qualification, the trial court told the first of three jury pools the following:

> As you are sitting here in this courtroom this morning, you are making history. And let me explain to you why you are making history. When this pandemic came about back in March, the Chief Justice of our Supreme Court decided that all trials would be stopped. We've had limited court functions going on since that time. But have had no trials since about mid-March. Well, the Chief Justice decided . . . that he wanted jury trials to start back and needed a test jury trial. And he selected Laurens County to be that test jury county. So I want you to know how important this is. And we have . . . put in a lot of thought and consideration to taking precautions to keep everyone as safe as we possibly can.[1]

After roll call, the trial court noted that "we have a lot of people that have an interest in this trial." He told the prospective jurors that if they were selected, he wanted them "to do everything [they could] to make this trial a success. We have a lot of eyes on this trial." He said "if it is successful and the second test jury trial in Horry County next week if that is successful, then I believe the Chief Justice will open things back up for more trials throughout the state. So we're going to work very hard to make it a success." During the qualifications of each of the three prospective jury panels, the trial court noted that an indictment did not mean Elmore was guilty or innocent and that the indictment contained mere allegations. During the qualification of jury pools A and B, the trial court noted that Chief

---

[1] The trial court's comments to jury pools B and C were similar but not as extensive.

Justice Beatty was in the courtroom. After jury selection, Elmore objected to the trial court's remarks as coercive, arguing the jurors would associate the "success" of the trial with the necessity of reaching a verdict. Elmore stated that pointing out the presence of the Chief Justice and other court officials added to the pressure the jury might feel to reach a verdict.

Crystal Bluford testified she dated Elmore from February 2018 until August 2018. Their relationship ended after an unspecified altercation, but she still saw him to receive weekly restitution payments. In September 2018, Bluford invited her friend, Sergio Mandez Lindsey, to her house. Lindsey had been traveling and went to take a nap on Bluford's bed. Bluford eventually joined him on the bed and fell asleep. She awoke to find Elmore in her bedroom punching Lindsey, and he then punched her.[2] Elmore pulled out a knife. Bluford ran out of the house and hid in her neighbor's garage. Elmore found her, took her back to the house, and told her that he had killed Lindsey. Bluford stated that Elmore told her he had been watching her and Lindsey sleep for two hours while deciding whether he was going to kill her, Lindsey, or both of them.

When Bluford went back in the house, Elmore dragged Lindsey from the bedroom to the kitchen, leaving a trail of blood. Bluford testified that Lindsey made a grunting sound when he was on the kitchen floor and Elmore grabbed one of the kitchen knives. Bluford left Elmore and Lindsey in the kitchen, drove Lindsey's car to her neighbor's front yard, and called 911.

Deputy Daniel Duckett responded to Bluford's 911 call. He entered the house with other deputies and observed a "trail of blood" in the hallway from the bedroom to the kitchen. Duckett saw Lindsey's body with two wounds on his back. Duckett smelled smoke and saw clothing that was later determined to be Elmore's burning in a small fire near the house. Investigators established that fingerprints around the kitchen window matched Elmore's. Elmore was not at the crime scene, but deputies found him hiding in a closet at his sister's house later in the afternoon.

After Elmore's arrest, he changed his statement a few times but eventually admitted he was at Bluford's house the previous evening. Investigators told Elmore that the clothing burning in the fire was the same clothing he was wearing in a video from his workplace earlier in the day. In Elmore's second statement to investigators, he claimed he walked into Bluford's house through the unlocked front door and went to her bedroom. Bluford and "some other guy" were in the bedroom. Elmore

---

[2] Investigators observed injuries to Bluford's mouth.

wrote "the dude tried to hit me. I hit him, he falls over. He gets ready to reach for something. And I have a knife on the dresser. I grab it and I stab him. . . . I stab him some more until he let[s] me go." Elmore stated Lindsey had hold of him and would not let go. Elmore told investigators he did not care what Bluford did with other men.

On cross-examination, Bluford stated she had flirted with Lindsey and exchanged suggestive photos but their relationship was not sexual. She testified she did not know how Elmore got into her house. She stated that Elmore usually brought her restitution payments on Friday afternoons and this incident happened on a Friday night. The defense introduced Facebook messages showing Elmore told Bluford he would be at her house at 4:00 a.m. on another night a few weeks before the incident. Bluford agreed that she messaged with Elmore about a week before the incident about him moving in with her. She also messaged that she loved him. On redirect-examination, Bluford stated Elmore did not have permission to be at her house at the time of the incident and she did not invite him over.

Dr. Michael Ward performed an autopsy on Lindsey's body and recorded blunt force injuries, drag marks, and twelve stab wounds. Lindsey had defensive injuries on his hands. Dr. Ward also determined that Lindsey's body was doused with an accelerant.

Elmore requested that the trial court instruct the jury on voluntary manslaughter, arguing Elmore was "waiting outside the room. He saw them in bed together and then went in and . . . basically did it." The trial court denied the request, noting that based upon Elmore's own admission there was "no heat of passion provocation to justify a manslaughter charge." The jury found Elmore guilty, and the trial court sentenced him to fifty years for murder, consecutive to five years on the possession of a weapon during the commission of a violent crime charge, and concurrent to a thirty-year sentence for burglary. This appeal followed.

## ISSUES ON APPEAL

I. Did the trial court err in making remarks to the jury regarding the importance of the success of the trial?

II. Did the trial court err by refusing to charge the jury on the lesser included offense of voluntary manslaughter?

## STANDARD OF REVIEW

In criminal cases, the appellate court sits solely to review errors of law. *State v. Wilson*, 345 S.C. 1, 5, 545 S.E.2d 827, 829 (2001). "In reviewing jury charges for error, this Court must consider the circuit court's jury charge as a whole in light of the evidence and issues presented at trial." *State v. Taylor*, 434 S.C. 365, 369, 862 S.E.2d 924, 927 (Ct. App. 2021) (quoting *State v. Simmons*, 384 S.C. 145, 178, 682 S.E.2d 19, 36 (Ct. App. 2009)).

## LAW/ANALYSIS

### I. Trial Court's Remarks

Elmore argues the trial court's remarks during jury qualification violated the principles set forth in the *Allen*[3] line of cases. He claims the trial court's remarks about the "importance" and "success" of the trial caused the jury to believe it must reach a verdict. He points to the jury reaching a verdict in less than two hours after multiple days of testimony as evidence of the coercion felt by the jury. We disagree.

Elmore's argument that the trial court's remarks were akin to an improper *Allen* charge is misplaced. "Whether an *Allen* charge is unconstitutionally coercive must be judged 'in its context and under all the circumstances.'" *Workman v. State*, 412 S.C. 128, 130, 771 S.E.2d 636, 638 (2015) (quoting *Tucker v. Catoe*, 346 S.C. 483, 490–91, 552 S.E.2d 712, 716 (2001)). Here, the deliberation phase of the trial had not begun, and the jury had not been impaneled. *See State v. Rampey*, 438 S.C. 519, 525, 885 S.E.2d 366, 369 (2022) (noting that when analyzing an *Allen* charge, the appellate court considers four factors from *Tucker*). Regardless, there was nothing in the trial court's remarks that equated the trial's "success" with the necessity of the jury reaching a verdict; rather, the remarks were in the context of the trial court's hope that Covid-19 safety precautions would enable the trial to proceed without postponement.

---

[3] *Allen v. United States*, 164 U.S. 492 (1896); s*ee also State v. Lee-Grigg*, 374 S.C. 388, 418 n.1, 649 S.E.2d 41, 57 n.1 (Ct. App. 2007) (*Allen* charge advises deadlocked jurors "to have deference to each other's views, that they should listen, with a disposition to be convinced, to each other's argument" (quoting Black's Law Dictionary, 74 (6th ed. 1990))); *State v. Taylor*, 427 S.C. 208, 214, 829 S.E.2d 723, 727 (Ct. App. 2019) ("South Carolina approves the use of a modified *Allen* charge, which must be neutral and even-handed, instruct both the majority and minority to reconsider their views, and cannot be directed at the jurors in the minority.").

The remarks should be viewed in the context of whether the trial court abused its discretion in a way that prejudiced Elmore. "The conduct of a criminal trial is left largely to the sound discretion of the trial [court; it] will not be reversed in the absence of a prejudicial abuse of discretion." *State v. Reyes*, 432 S.C. 394, 401, 853 S.E.2d 334, 337–38 (2020) (quoting *State v. Bryant*, 372 S.C. 305, 312, 642 S.E.2d 582, 586 (2007)). "An abuse of discretion occurs when a trial court's decision is unsupported by the evidence or controlled by an error of law." *Id.* at 401, 853 S.E.2d at 338 (quoting *Bryant*, 372 S.C. at 312, 642 S.E.2d at 586). "It has long been recognized that even a slight remark, apparently innocent in its language, may, when uttered by the court, have a decided weight in shaping the opinion of the jury." *State v. Pruitt*, 187 S.C. 58, 61, 196 S.E. 371, 372 (1938).[4] Further, "the trial judge must refrain from all comment which tends to indicate his opinion as to the weight or sufficiency of the evidence, the credibility of the witnesses, the guilt of the accused, or as to the controverted facts." *Id.* at 61, 196 S.E. at 373.

We find the trial court's remarks were made solely in the context of the unprecedented pandemic and did not prejudice Elmore. Importantly, the trial court did not comment on the sufficiency of the evidence, the credibility of the witnesses, the guilt of the accused, or the controverted facts. The remarks were made before the case was called, and when the case was called, the trial court stated the indictment did not show Elmore's guilt or innocence and the indictment was a mere allegation. The trial court emphasized the importance of the procedures in place to prevent Covid-19 transmission and made it clear the jury was a "test jury" in the resumption of jury trials in South Carolina. *See State v. Bridges*, 278 S.C. 447, 448, 298 S.E.2d 212, 212 (1982) (holding that, in general, "the conduct of a criminal trial is left largely to the sound discretion of the presiding judge and [the appellate court] will not interfere unless it clearly appears that rights of the complaining party were abused or prejudiced in some way").

## II. Voluntary Manslaughter

Elmore argues the trial court erred in denying his request to instruct the jury on voluntary manslaughter. We disagree.

---

[4] The *Pruitt* trial court made extensive comments on the evidence and noted that "women of the lowest type" frequented the defendant's establishment. *Id.* at 60, 196 S.E. at 372.

Voluntary manslaughter is a lesser-included offense of murder. Voluntary manslaughter is the unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation. Both heat of passion and sufficient legal provocation must be present at the time of the killing, and there must be evidence of both to receive a voluntary manslaughter charge. As such, a defendant is not entitled to a voluntary manslaughter charge merely because he was in a heat of passion. Similarly, a defendant is not entitled to a voluntary manslaughter charge merely because he was legally provoked. Rather, there must be evidence that the heat of passion was caused by sufficient legal provocation.

*State v. Sims*, 426 S.C. 115, 131, 825 S.E.2d 731, 739 (Ct. App. 2019) (internal citations omitted).

"In determining whether the evidence requires a charge on a lesser included offense, the court views the facts in a light most favorable to the defendant." *State v. Brayboy*, 387 S.C. 174, 179, 691 S.E.2d 482, 485 (Ct. App. 2010). "To justify charging the lesser crime, the evidence presented must allow a rational inference the defendant was guilty *only* of the lesser offense." *State v. Geiger*, 370 S.C. 600, 607, 635 S.E.2d 669, 673 (Ct. App. 2006) (emphasis added).

While Elmore contends that Bluford was his "on again off again girlfriend" and he was therefore in a heat of passion, this contention does not comport with the evidence presented at trial. Defense counsel asked Bluford if the relationship was "on again off again" with Elmore, and she answered "once or twice." She clarified that the relationship was sexual after they broke up "once or twice." Bluford testified she did not keep it a secret from Elmore that she was seeing other men after they broke up. She testified multiple times that she was not in a relationship with Elmore. Regardless of how Elmore attempted to characterize the relationship, Bluford testified that Elmore did not have permission to be in her house on the night of the incident. She did not invite him over that evening. There was no evidence presented that showed Elmore was in a situation that would "naturally disturb the sway of reason and render the mind of an ordinary person incapable of cool reflection and produce what may be called an uncontrollable impulse to do violence." *State v. Sams*, 410 S.C. 303, 309, 764 S.E.2d 511, 514 (2014).

Elmore's own statement does not present evidence to support a charge of voluntary manslaughter. Elmore stated that Bluford was in the bedroom with "some guy" who tried to hit him. While this supported the jury instruction of self-defense, it does not support an instruction on voluntary manslaughter. *See State v. Niles*, 412 S.C. 515, 523, 772 S.E.2d 877, 881 (2015) ("Because [the defendant], by his own testimony, lacked the intent to harm the victim, we cannot see how a voluntary manslaughter charge would have been appropriate under these facts."). Therefore, the trial court did not err in refusing Elmore's requested voluntary manslaughter jury instruction.

**CONCLUSION**

Accordingly, Elmore's convictions are **AFFIRMED.**

**WILLIAMS, C.J., and GEATHERS and VERDIN, JJ., concur.**