# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Demontay Markeith Payne, Appellant.

Appellate Case No. 2017-002014

———————

Appeal From Barnwell County
Doyet A. Early, III, Circuit Court Judge

———————

Opinion No. 5846
Heard September 15, 2020 – Filed August 11, 2021

———————

## REVERSED AND REMANDED

———————

Appellate Defender Susan Barber Hackett, of Columbia,
for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy
Attorney General W. Jeffrey Young, Deputy Attorney
General Donald J. Zelenka, Senior Assistant Deputy
Attorney General Melody Jane Brown, Assistant
Attorney General William Joseph Maye, all of Columbia;
and Solicitor John William Weeks of Aiken, all for
Respondent.

———————

**HUFF, J.:** Demontay Markeith Payne appeals his conviction for murder, asserting
the trial court erred in (1) failing to instruct the jury on voluntary manslaughter and
(2) refusing to tailor its self-defense instruction to include language concerning a
defendant's justification in continuing to shoot until the apparent danger has

ceased.  Because we find, under the facts presented before the jury, Payne was entitled to a voluntary manslaughter instruction, we reverse and remand for a new trial.

## FACTUAL/PROCEDURAL HISTORY

This matter stems from the shooting death of Devante Odom (Victim).  Essentially, three different versions of what occurred just before and at the time of the shooting were presented to the jury.  The State presented eyewitness testimony from Alicia Youmans, while Payne presented the eyewitness testimony of Alicia's sister, Tyeisha Youmans, as well as his own testimony.

Alicia stated that she knew Payne and Victim from growing up in the same neighborhood and Victim was a close friend of her brother.  She testified that on the night of May 23, 2015, she was sitting outside Stacey Hartzog's home with Tyeisha, her friend Yvette, and Payne "having some girl talk" when Victim walked up "from the backside."[1]  Payne had arrived at the location, driving "straight across the yard." Victim spoke to Alicia, Tyeisha, and Yvette, but he did not speak to Payne.  Victim asked Alicia for two cigarettes, which she was going to give him.  However, before she could retrieve them from inside the house, Victim and Payne began to argue.  Alicia did not know what they were arguing about.

The argument ended when Victim walked away, and Payne got into his car.  Victim walked up Wingo Estates Road toward Emerald Lane.  Payne got into his car and pulled onto Wingo and drove up toward Emerald, in the same direction Victim walked.  Victim made it to Emerald and was at the intersection.  Alicia stated there was a streetlight at the intersection on Emerald and she could clearly see what was happening in the intersection.[2]  Alicia testified that after Payne pulled away no one else was outside with her, as Tyeisha and Yvette had walked inside the home.  Alicia then described as follows:

---

[1] Alicia did not know if Victim was welcome at Hartzog's home, but she thought Payne would have been welcome there.

[2] Alicia estimated the distance between where she was and the intersection to be "about a hundred yards or so."

Payne drove his car up to Emerald … him and [Victim] had another verbal dispute or whatever, he got out of his car, they was still arguing or whatever, and he turned to go back to his car. I'm not sure if something was said or what happened, but he — — when he turned back around to face [Victim], he began shooting at him.

Alicia stated that she observed Payne and Victim "going back and forth" before Payne exited his car, and when Payne stopped his car and exited the vehicle, he was continuing to argue with Victim. When Payne turned to go back toward his car, he never made it to the car, but turned back around and "just started firing" at Victim. Once Victim started getting shot by Payne while on the street, he attempted to run between some trailers to get away.

Alicia realized Victim had been hit when she saw him fall to the ground and he started waving his arm in the air. Alicia called 911 and told them someone had been shot and needed help. Though she did not initially identify Payne as the shooter, she did so in a subsequent call. She also indicated in her verbal and written statements to an investigator that she saw Payne start shooting at Victim. By the time Alicia walked up to Victim, more than five people had gathered around. She did not see Victim with a gun and did not see a gun on the ground in the area of Victim. Alicia testified regarding numerous street lights in the area between Hartzog's home and where the shooting took place, and she agreed it was "pretty well lit up at night."

On cross-examination, when Alicia was asked who started the argument, she replied, "I would say Mr. Payne initiated it." Alicia estimated Payne was at the location ten to fifteen minutes before Victim arrived and, during that time, his demeanor was calm. She believed that Payne started the argument because, while he was sitting with the women, he lifted his shirt to show a gun when Victim walked up to them. Alicia read her written statement into the record, which provided as follows:

On May 23, 2015, I was sitting outside at Wingo Estates talking with … Payne when [Victim] came up walking and asked me for two cigarettes. As I was getting them, he and … Payne had some exchanged words. I didn't hear what they were saying. I only heard [Victim] state to … Payne you're going to have to show me you're going to kill me.

[Victim] walked up the road and … Payne got into his car and drove up the road.  He stopped, they exchanged words.  [Payne] got out of his car swinging his arms.  After that they got real close to each other, and that's when … Payne pulled out his gun and shot [Victim].  He jumped back into his car and left.

Alicia acknowledged that she did not mention a gun being in Payne's waistband or Payne showing a gun in her statement—or any subsequent statement—and agreed it would have been a very important fact to include.  Alicia stated that Payne drove on Wingo, not across the yard to his residence, and he never pulled into his yard.

Brandy Williams testified she was at her parents' home on the night of May 23, 2015, when she heard seven to nine gunshots and called 911.  After placing the call, she went over to the scene, where she observed two individuals next to Victim, who was lying on the ground.  Williams performed CPR on Victim for thirty minutes, until EMS arrived.  The Sheriff's Office arrived along with EMS.  She stayed there about ten minutes after their arrival, and there was a large crowd of ten to fifteen people gathered by the time she left.  She never saw a weapon on or near Victim.  Williams agreed the Sheriff's Office was not there during the time she performed CPR, there were people walking back and forth around Victim's body, and the scene remained unsecure for those thirty minutes.

Investigator Andy Chavis, who was the on-call investigator at the time of the incident, testified Victim had already been taken from the scene and another officer had taped off the area when he arrived.  Investigator Chavis photographed the overall scene and the evidence.  He testified that six .380 caliber cartridge casings were recovered in front of a residence, with some of them in the road and a few in the yard, in an area of about six to eight feet.  Investigator Chavis testified a .40 caliber cartridge casing was also found, and he stated it was located "close to where they said [Victim] was [lying]" and where he observed blood and items left by EMS.  He performed a gunshot residue (GSR) test on Victim later that night at the morgue.  A .380 caliber projectile was removed from Victim's body during his autopsy.  Unfortunately, Investigator Chavis' photographs were lost, and he acknowledged the location of the shell casings was just an estimate on his part.  He further agreed there would be an opportunity for crime scene contamination in a crime scene that was open for thirty minutes.

Tyler Sturkie, a SLED forensic scientist in the trace evidence department, testified regarding the results of the GSR test from Victim.  Particles of GSR, particles consistent with GSR, and particles associated with GSR were found on Victim's right hand.  As to his left hand, particles of GSR, one particle consistent with GSR, and one particle associated with GSR were found.  Sturkie testified that finding GSR meant one of three things: the individual fired a weapon; the individual was in the vicinity when a weapon was fired; or the individual touched an object that had GSR on it.

SLED Agent James Green testified as an expert in the field of firearms identification.  He examined the .380 caliber cartridge cases recovered from the scene as well as a .40 S&W caliber cartridge case.  Agent Green opined the .40 S&W caliber was much larger and had different class characteristics from the .380 caliber cartridge cases and was not fired from the same gun.  He further testified that the .380 caliber bullet recovered from Victim could have been fired from the same gun that fired the .380 caliber cartridge casings found at the scene.  Agent Green acknowledged his report provided that the .40 S&W caliber cartridge casing was "collected from beside [V]ictim's body."  Victim's autopsy revealed he suffered four gunshot wounds.

Investigator Scott Peterson testified he was initially called to the scene that night to help with crowd control, but the crowd had already dispersed by the time he arrived.  He met with Alicia, and he was wearing a body camera that recorded her explanation of what had occurred that night.  Alicia also provided him with a written statement.  Investigator Peterson testified law enforcement attempted to locate other potential witnesses to the shooting, but he had no knowledge of anybody else who saw what happened.

Tyeisha testified that she was sitting outside Hartzog's home on May 23, 2015, with Alicia, Payne, and her aunt, Yvette Walker.  Payne, who had driven up to the location, was engaged in conversation with the women and his demeanor was calm.  Tyeisha, who had music playing in her car for the gathering, went to her car to change the music when she heard people "sounding like they [were] . . . arguing."  She did not see Victim initially when he walked up because she was looking at her phone, but she looked up when she heard the arguing.  She did not recall what was said during the argument or exchange.  Tyeisha walked up to the porch to see what was happening, and Payne and Victim were still interacting, going back and forth.  Tyeisha testified the two "[were not] necessarily arguing, arguing, but they [were] just having words back and forth."  The exchange lasted a few minutes and ended with Victim saying he was going to walk to the top of the

road, which was the intersection of Emerald and Wingo. Tyeisha did not know anything about Payne lifting his shirt to show a firearm at that time.

After Victim walked toward Emerald, Payne got in his car to leave. Tyeisha assumed Payne was going home, which was right next door to their location. Payne turned out of the yard, got on Wingo, and turned right back into his yard. By then, Victim was at the top of the road. Tyeisha stated that once Payne got into the car, she believed they "started having words again because you could tell that they [were] . . . talking back and forth." Payne walked into the road and the two men were standing on Emerald having words when Tyeisha saw Payne try to punch Victim. She observed Victim move back so he would not get hit, and Victim then pulled out a handgun. Payne then "had . . . his hands. . . like 'I guess you don't want to fight' . . . . [T]hey [were] still . . . kind of having words, because [Payne] kind of turned — — he turned around from him going back in the direction of the house." Victim was trailing behind Payne, and "they had to be still having words because [] Payne turned around and they [were] still, like, having words." Tyeisha explained that when she said Victim was trailing Payne, she meant that when Payne turned to walk in the direction of his house, Victim was coming behind him. Tyeisha testified she could tell they were still arguing as Payne was walking toward his house and Victim was following behind him because Payne turned around and faced Victim. Victim then "started firing" and Payne "started firing . . . right after that, it was consecutive." Tyeisha testified she could tell Victim fired first because she "could see it coming from . . . his direction."

In the middle of the shooting, Victim turned around and ran to get away. While he was running, Payne was shooting. Victim attempted to run between two trailers. When Payne stopped shooting, he got in his car and left. Tyeisha thought Victim had run between the trailers, but he had actually fallen on the ground. She did not see Victim fall but heard him gasping for air, and she went to him. When she got to Victim's location, Tyeisha saw Victim's gun right beside him.

Tyeisha stated there were only a few people with Victim at that time. One person was applying pressure on his wounds, and there was another person there with her as well. There was talk of someone coming to administer CPR, but Tyeisha testified she never saw someone actually doing so. Tyeisha stayed in the area of Victim about ten to fifteen minutes before she left the scene. At that time there were about thirty people out there, and law enforcement had not yet arrived. Tyeisha testified that there was no doubt in her mind that Victim shot at Payne first.

On cross-examination, Tyeisha acknowledged testifying in an earlier hearing that she had stated one person was putting pressure on Victim's wounds "and the other was trying to do CPR."  She denied that occurred, though, explaining there was someone there who "kept saying she was going to give him CPR," but she was not doing that.  Tyeisha confirmed that she observed the shooting from Hartzog's front yard, about a football field length away, and she could hear Victim gasping for air from that distance.  She stated that when Payne left from Hartzog's home, he drove onto the road and made a right turn into his own driveway, parking parallel to his trailer on the end closest to Emerald; he got out of his vehicle, walked onto Emerald, confronted Victim, and had words with him; Payne took a swing at Victim, at which point Victim pulled out a pistol; Payne walked back toward his car and his home, at which point Victim shot at Payne; and Payne shot back at Victim.  When asked if Payne shot over his shoulder or turned around, Tyeisha stated Payne turned around.  She explained that Payne was walking toward his home, the two men were still "having words," Victim was following behind Payne, Payne turned around as they were having words, and then they started shooting.  Tyeisha estimated Payne was five to ten feet from his car and five to seven feet from Victim.  When asked where all this occurred, she stated, "At first it was in the road and then they came back in the yard and it was on the grass a little bit."  They were in the road when Payne took the swing at Victim, and the shooting happened in the yard on the grass, not far from Emerald.

Payne testified concerning his version of the events of May 23, 2015.  He stated he drove to the location and, like the testimony of Alicia and Tyeisha, said he was talking to Alicia, Tyeisha and Yvette.  He was sitting in a chair at the bottom of the steps, and Tyeisha was by her car.  Payne was laughing and listening to the ladies talk.  He had been there for over twenty minutes when Victim walked from behind the home.  Victim asked Alicia if he could buy two cigarettes.  While Alicia was going into the home to get the cigarettes, Victim "said something to [Payne] that he could not quite remember."  The two men "engaged in a verbal argument or exchanged words, and that was it."  Payne remembered telling Victim, "I ain't worrying about it."  Asked about the tone of their interaction, Payne stated he was calm but Victim "was more like, okay, okay, like, you know, I guess to like, we going to see about it, this, that, and the third."  Victim never received the cigarettes.  After their exchange, the women told Victim to leave.

Victim went to the top of Emerald and Wingo, standing at the edge of Payne's grandmother's yard.  The women told Payne not to follow Victim, and Payne said he would not.  Payne drove next door to his grandmother's home.  Payne stated he

drove through the yard to get next door, and at this time Victim was at the top of the road at the intersection by Payne's yard. As Payne was exiting his car, parked at the edge of their trailer, he saw Victim coming. When asked what happened next, Payne replied, "We exchanged words. After he fired, I fired back in self-defense." Payne explained that after Victim fired at him, he was "backing up shooting . . . not paying attention to where [he] was shooting." He testified he was backing up because he was "afraid for [his] life." Payne did not recall how many shots were fired, but understood from a report that Victim was hit four times. He did not see where Victim ran because he was "looking back running." Payne testified that after the exchange of gunfire, he was scared. He jumped in his car and pulled away and, when he looked to his left, he saw Victim on the ground. Payne testified he did not believe he was at fault on May 23, 2015. He stated he responded in the manner that he did because Victim fired at him, he could not have taken another course, and he had no other choice than to respond as he did. He testified there was no doubt in his mind that Victim fired at him first.

On cross-examination, Payne acknowledged he knew Victim had a gun because he could see a bulge on his side when Victim first approached Hartzog's house. He testified he did not remember what they were arguing about, and stated "I just remember him saying certain words to me and I said I wasn't going to follow him up, I wasn't worried about it." When challenged as to why the women would have to tell him not to follow Victim if he was calm, Payne replied, "Because he went to the top of the road and stayed there." Asked if he "drove straight . . . across the grass," Payne responded affirmatively. When the solicitor asked if he had not gone "down to Wingo … and … back into the driveway," Payne stated, "I don't remember that, sir." He also stated he did not remember whether his car door was still open when he exited the vehicle and Victim started coming toward him and fired, but he thought that it was. He did not remember how many times Victim shot at him. Payne agreed with the solicitor that Victim was walking toward him as he was exiting his car, Victim started shooting at him, and Payne started "firing and backing up." The solicitor then asked how Payne backed up if he was standing at the car with the door open and Victim started shooting at him. Payne replied, "When you're backing up not looking, you can't see who you're shooting at or what you're shooting, you just know you're shooting to get someone away from you or anything that's firing at you." Payne agreed he was "backing up toward the house" and was not "paying attention where [he was] shooting." The solicitor asked Payne "When did you have the verbal confrontation with [Victim] in the middle of Emerald?" Payne stated he did not remember. He also testified he did not remember swinging at Victim in the middle of Emerald. The following colloquy then occurred:

[Solicitor]: What were you and [Victim] arguing about when you were standing in the middle of Emerald Lane after he had walked away, after you had driven up, and after you came back together? What were the two of you arguing about then?

[Payne]: I don't remember, sir.

[Solicitor]: Well, did it happen or did it not happen?

[Payne]: I don't remember if it happened or not. It was two years ago.

Payne testified he believed he had his gun on him when he exited the car. When asked why he was carrying a gun that night, Payne explained, "I had received threats from other individuals that . . . used to hang with him." He agreed that he received threats from people who "used to hang with [Victim]" but denied that he knew there was a problem between him and Victim. When asked if he thought there was a problem between him and Victim after they had their argument, Payne replied that Victim probably had a "hostile feeling" about him.

Former Barnwell County Sheriff's Deputy Brian Johnson testified he was the first officer to arrive at the incident location. He described the scene as chaotic with a large number of people—more than twenty—and testified "it was difficult, to say the least, to secure the scene." They had to call for additional units from Barnwell, Williston, and Blackville to control the crowd and secure everything. EMS stood by and would not enter the scene until it was secured. Chief Johnson testified Jerome Creech told him that Tyeisha Youmans was on the scene that night, and confirmed he had information on the night of the incident that Tyeisha was at the scene. He stated that Creech said he saw a female standing by Victim and another person he identified as Tyeisha, "and then the shooting started." He did not know if anyone "follow[ed] up with Jerome Creech."

At the close of evidence, defense counsel requested the trial court charge the jury that "[i]f the defendant is justified in firing the first shot, the defendant is justified in continuing to shoot until it is apparent that the danger to his life and body has ceased." He also sought a charge on voluntary manslaughter. The trial court declined to charge voluntary manslaughter, reasoning there was no factual basis that Payne acted in a sudden heat of passion or that his fear created an

uncontrollable impulse to do violence. The trial court also declined to give the requested "continuing to shoot" charge, stating such was "more or less a charge on the facts." The trial court thereafter gave the jury a very limited and general self-defense charge. The jury found Payne guilty of murder, and the trial court sentenced him to thirty-five years' imprisonment.

## ISSUES

1.      Whether the trial court erred in failing to instruct the jury on voluntary manslaughter when (1) the undisputed evidence showed Payne and Victim were in a heated argument immediately prior to the shooting; (2) there was additional evidence that Victim pulled a gun and shot at Payne immediately prior to Payne returning fire; and (3) the trial court based its decision not to instruct the jury on the lesser-included offense on the fact that Payne testified that he did not remember the content of the argument.

2.      Whether the trial court erred in failing to tailor the self-defense instruction to the evidence presented, including that if a defendant is justified in firing the first shot, the defendant is justified in continuing to shoot until it is apparent that the danger to his life and body has ceased.

## STANDARD OF REVIEW

"In reviewing jury charges for error, we must consider the [trial] court's jury charge as a whole in light of the evidence and issues presented at trial." *Barber v. State*, 393 S.C. 232, 236, 712 S.E.2d 436, 438 (2011) (quoting *State v. Mattison*, 388 S.C. 469, 478, 697 S.E.2d 578, 583 (2010)). "To warrant reversal, a trial [court's] charge must be both erroneous and prejudicial." *State v. Otts*, 424 S.C. 150, 155, 817 S.E.2d 540, 543 (Ct. App. 2018) (quoting *State v. Taylor*, 356 S.C. 227, 231, 589 S.E.2d 1, 3 (2003)).

## LAW/ANALYSIS

### I.      Failure to Instruct Voluntary Manslaughter

"The trial court is required to charge a jury on a lesser-included offense if there is any evidence from which it could be inferred the lesser, rather than the greater, offense was committed." *State v. Williams*, 427 S.C. 148, 156, 829 S.E.2d 702, 706 (2019) (quoting *Suber v. State*, 371 S.C. 554, 559, 640 S.E.2d 884, 886 (2007)). "In determining whether the evidence requires a charge on a lesser-

included offense, we view the facts in the light most favorable to the defendant." *Id.*

## A. General Voluntary Manslaughter Law

> Voluntary manslaughter is the intentional and unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation. The sudden heat of passion, upon sufficient legal provocation, while it need not dethrone reason entirely, or shut out knowledge and volition, must be such as would naturally disturb the sway of reason, render the mind of an ordinary person incapable of cool reflection, and produce what, according to human experience, may be called an uncontrollable impulse to do violence. In determining whether the act which caused death was impelled by heat of passion or by malice, all the surrounding circumstances and conditions are to be taken into consideration, including previous relations and conditions connected with the tragedy, as well as those existing at the time of the killing.

*State v. Smith*, 391 S.C. 408, 412-13, 706 S.E.2d 12, 14-15 (2011) (citations omitted). "[A]n overt, threatening act or physical encounter *may* constitute sufficient legal provocation." *Id.* at 413, 706 S.E.2d at 15. "For a defendant to be entitled to a voluntary manslaughter charge, there must be evidence of both sufficient legal provocation and heat of passion at the time of the killing." *Id.* "Even when a person's passion has been sufficiently aroused by a legally adequate provocation, if at the time of the killing those passions had cooled or a sufficiently reasonable time had elapsed so that the passions of the ordinary reasonable person would have cooled, the killing would be murder and not manslaughter." *State v. Pittman*, 373 S.C. 527, 575, 647 S.E.2d 144, 169 (2007).

"To warrant the court eliminating the charge of manslaughter, there must be no evidence whatsoever tending to reduce the crime from murder to manslaughter." *State v. Starnes*, 388 S.C. 590, 596, 698 S.E.2d 604, 608 (2010). "If there is any evidence from which it could be inferred the lesser, rather than the greater, offense was committed, the defendant is entitled to such charge." *Id.* "Whether a voluntary manslaughter charge is warranted turns on the facts. If the facts disclose any basis for the charge, the charge must be given." *Id.* at 597, 698 S.E.2d at 608.

"When determining whether the evidence requires a charge on voluntary manslaughter, the court must view the facts in the light most favorable to the defendant." *State v. Niles*, 412 S.C. 515, 522, 772 S.E.2d 877, 880 (2015).

> Where death is caused by use of a deadly weapon, words alone, however opprobrious, are not sufficient to constitute a legal provocation. Rather, when death is caused by the use of a deadly weapon, the opprobrious words must be accompanied by the appearance of an assault—by some overt, threatening act—which could have produced the heat of passion.

*State v. Locklair*, 341 S.C. 352, 360, 535 S.E.2d 420, 424 (2000) (citations omitted).

"A defendant is not entitled to a voluntary manslaughter charge merely because he was in a heat of passion." *Starnes*, 388 S.C. at 596, 698 S.E.2d at 608. Nor is he entitled to a voluntary manslaughter charge merely because he was legally provoked. *Id.* at 597, 698 S.E.2d at 608. "Moreover, there must be evidence that the heat of passion was caused by sufficient legal provocation." *Id.* Though one's fear immediately following an attack or threatening act may cause the person to act in a sudden heat of passion, the mere fact that one is afraid is insufficient, alone, to entitle a defendant to a voluntary manslaughter charge. *Id.* at 598, 698 S.E.2d at 609. "[I]n order to constitute 'sudden heat of passion upon sufficient legal provocation,' the fear must be the result of sufficient legal provocation **and** cause the defendant to lose control and create an uncontrollable impulse to do violence." *Id.* "Succinctly stated, to warrant a voluntary manslaughter charge, the defendant's fear must manifest itself in an uncontrollable impulse to do violence." *Id.* at 598-99, 698 S.E.2d at 609.

> A person may act in a deliberate, controlled manner, notwithstanding the fact that he is afraid or in fear. Conversely, a person can be acting under an uncontrollable impulse to do violence and be incapable of cool reflection as a result of fear. The latter situation constitutes sudden heat of passion, but the former does not. Evidence that fear caused a person to kill another person in a sudden heat of passion will mitigate a homicide from murder to manslaughter—it will not

> justify it.  This is the distinction between voluntary
> manslaughter and self-defense.

*Id.* at 599, 698 S.E.2d at 609.  "[E]vidence of self-defense and voluntary manslaughter may coexist and . . . a charge on self-defense **and** voluntary manslaughter may be warranted" under the appropriate circumstances.  *Id.*

## B.  Specific Voluntary Manslaughter Charge Cases

The parties cite to appellate decisions in which our courts have either found a voluntary manslaughter charge warranted or unwarranted based upon the facts of the case.  We discuss several of the cases addressing the opposing determinations below.

In *State v. Gilliam*, 296 S.C. 395, 396, 373 S.E.2d 596, 597 (1988), the defendant appealed his murder conviction, asserting he was entitled to a charge on the lesser-included offense of voluntary manslaughter.  There, the defendant, who had been in a previous relationship with Daisy, physically assaulted Daisy at her place of work.  *Id.*  The defendant was angry with Daisy because Daisy persisted in making harassing phone calls to his wife.  *Id.*  Daisy also taunted the defendant, provoking his attack.  *Id.*  A few hours after his assault on Daisy, the defendant went to the Brown Derby to look for the victim—Daisy's lover—because Daisy had told the defendant that the victim wanted to see him.  *Id.*  The defendant testified that he had no intention of shooting the victim.  *Id.*  Upon the defendant finding the victim, "[t]he two men began arguing and [the victim] made threatening statements to [the defendant]."  *Id.*  "[The victim] then took a gun from his pocket and shot at [the defendant] before [the defendant] could reach his own gun."  *Id.*  "[The defendant] shot back at [the victim], killing him."  *Id.*  Our supreme court determined the evidence supported a charge of voluntary manslaughter, concluding "[the defendant's] testimony that the victim threatened him and then fired at him would support a finding of sufficient legal provocation and heat of passion."  *Id.* at 397, 373 S.E.2d 597.

In *State v. Lowry*, 315 S.C. 396, 399, 434 S.E.2d 272, 274 (1993), our supreme court reversed the defendant's murder conviction, finding he was entitled to a charge on voluntary manslaughter under the facts of his case.  There, the defendant and some friends were outside a grocery store when the victim approached the group and began berating the defendant.  *Id.* at 398, 434 S.E.2d at 273.  The two men argued and "bumped chests," and the defendant aimed an unloaded pistol at the victim and pulled the trigger.  *Id.*  One of defendant's companions broke up the

fight, and the victim entered the grocery store. *Id.* After he loaded a clip of ammunition into his pistol and fired a single shot into a sign located nearby, the defendant followed the victim into the grocery store, and the two men began arguing and shouting at each other again. *Id.* "According to the State's witnesses, [the defendant] challenged the [victim] to 'take it outside,' to which the [victim] replied, 'Man, I am unarmed. Do you expect me to walk outside and let you kill me?'" *Id.* While there was some evidence that the victim spread his arms away from his body to show he had no weapon, the defendant's witnesses testified that the victim "belittled [the defendant] by telling him, 'You think you are a big man because you got a gun,'" and "then moved toward [the defendant] in a menacing fashion with his arms and hands outstretched toward [the defendant] as if to grab him." *Id.* After the victim raised his arms, the defendant shot him in the chest, the victim fell, and the defendant cursed the victim and then shot him again, this time in the head. *Id.* In finding the defendant was entitled to a voluntary manslaughter charge, the court determined, "[h]ere, there is testimony which, if believed, tends to show that the [victim] and [the defendant] were in a heated argument and that the [victim] was about to initiate a physical encounter when the shooting occurred." *Id.* at 399, 434 S.E.2d at 274. Noting that, in order to eliminate the offense of manslaughter as a lesser-included offense, "it should very clearly appear that there is no evidence whatsoever tending to reduce the crime from murder to manslaughter," the court "conclude[d] that the trial [court] erred in refusing to instruct the jury regarding the offense of voluntary manslaughter." *Id.*

In *State v. Wiggins*, 330 S.C. 538, 549, 500 S.E.2d 489, 495 (1998), the defendant appealed his voluntary manslaughter conviction, asserting the trial court erred in submitting the issue of voluntary manslaughter to the jury. The evidence revealed the victim spoke with the defendant the day after the defendant's wife had barred the victim from a restaurant/bar attached to a motel run by the defendant and his wife. *Id.* at 540-541, 500 S.E.2d at 490-491. The defendant took the victim to speak with the defendant's wife and left. *Id.* at 541, 500 S.E.2d at 491. The victim and the defendant's wife argued, the wife stuck to her decision, and the victim angrily left the motel. *Id.* A few hours later, the victim's sister came to the motel and demanded to speak to the defendant's wife regarding the victim being barred from the premises. *Id.* According to the defendant, the sister was angry and threatened to physically attack his wife. *Id.* The defendant threatened to "kick her ass" if she tried to attack his wife, and the sister threatened to bring the family back later that night to "shut the place down." *Id.* The victim's brother and the victim arrived at the scene, and as the victim sat in his sister's car, the defendant approached the side of the car where the victim sat. *Id.* at 542, 500 S.E.2d at 491. An argument ensued between the defendant and the victim's sister, and she

informed the victim the defendant had threatened to "kick her ass." *Id.* According to the sister, the defendant stated, "Yes, I said it. I'll kick both of your asses," at which point the victim responded, "We'll settle this" and then turned to exit the car. *Id.* The sister testified there was a gun clipped to the victim's back, she saw the defendant had a gun in his hand, and she had exited the car when the defendant began shooting. *Id.* The sister stated the victim was never able to pull his gun out and fire it; that after the victim was hit with the first shot, he exited the car and began running, at which point his back was to defendant; and the defendant continued firing his gun. *Id.* The sister "unequivocally stated [the v]ictim never had a gun in his hand, or pointed a gun at [the defendant], while he was sitting in the car or before [the defendant] began shooting." *Id.* at 542-43, 500 S.E.2d at 491. The brother testified that as the victim was getting out of the car, the defendant pulled a gun from his pocket and began firing; the victim did not have a gun in his hand; the victim reached for his gun after the defendant fired the first shot; the victim staggered toward the back of the car as the defendant continued firing; after the first shot, the brother shouted for the victim to shoot the defendant, but the victim never raised his gun or fired at the defendant; and the gun fell from the victim's hand as he was being shot. *Id.* at 543, 500 S.E.2d at 492. The defendant gave a different version of the events surrounding the shooting. *Id.* He testified he was armed at the time because he was going home and it was his habit to take his gun home. *Id.* He did not think there would be a problem when the victim showed up because he believed they were on good terms. *Id.* He asked the victim to leave, but the victim ignored him or did not hear him. *Id.* He told the victim he had threatened to "whip [his sister's] ass[,] . . . but told [the v]ictim he did not mean it." *Id.* "He told [the v]ictim they did not need any problems, to which [the v]ictim responded, 'Yeah, we've got problems.'" *Id.* According to the defendant, "[the v]ictim got out of the car, took his sunglasses off with his right hand, and with his left hand pulled out a pistol." *Id.* He stated that the victim "cocked and pointed the gun at [him]," and as the victim was exiting the car, the brother yelled for the victim to shoot him. *Id.* at 543-44, 500 S.E.2d at 492. The defendant "got scared, pulled his own gun and fired." *Id.* at 544, 500 S.E.2d at 492. There was evidence the defendant fired his gun four times in rapid succession. *Id.* at 542 n.7, 500 S.E.2d at 491 n.7. An autopsy revealed the victim died of three gunshot wounds: two in the chest and one in the back. *Id.* at 544, 500 S.E.2d at 492. Our supreme court found no error in submission of the offense of voluntary manslaughter to the jury, stating as follows:

> We find there is evidence in the record which would tend
> to show [the defendant] acted in sudden heat of passion
> upon sufficient legal provocation. [The defendant] was

> in a heated argument with [the v]ictim and [the s]ister.
> He testified he was afraid for his life because [the v]ictim
> physically threatened him.  Contrary to his argument,
> fear can constitute a basis for voluntary manslaughter.

*Id.* at 549, 500 S.E.2d at 495.

In *State v. Johnson*, 333 S.C. 62, 63, 508 S.E.2d 29, 30 (1998), our supreme court again reversed a defendant's murder conviction for failure to give a voluntary manslaughter charge.  There, considering the evidence in the light most favorable to the defendant, the court noted the following facts:

> [I]n the early morning hours of December 12, 1995, [the
> defendant] was "hanging out" with Frank Moore, Travis
> Croft, and the victim . . . .  According to witnesses, [the
> victim] had taken the keys to [the defendant's] vehicle
> and wouldn't give them back to him.  [The victim] then
> went into his house, and [the defendant] left.  Moore and
> Croft were still outside [the victim's] house 15-20
> minutes later when [the defendant] returned.  [The
> victim's] live-in girlfriend . . . testified [the defendant]
> knocked on their door at approximately 2:00 AM and
> asked to speak to [the victim].  [The victim] came to the
> door and he and [the defendant] "had words."  [The
> victim] then went outside and "sort of pushed [the
> defendant] off the porch."  According to one witness, [the
> victim] was the first one to throw a punch.  Another
> witness testified that "[the victim] was getting the best of
> [the defendant]."  Several witnesses testified that, during
> the fight, [the defendant] took out a gun and shot [the
> victim] several times; [the victim] died a short time later.

*Id.* at 63-64, 508 S.E.2d at 30.

The court noted our law provides that the appellate court must view the facts in a light most favorable to the defendant in determining whether the evidence requires a charge on voluntary manslaughter, and "[t]o warrant a court's eliminating the offense of manslaughter, it should very clearly appear that there is no evidence whatsoever tending to reduce the crime from murder to manslaughter."  *Id.* at 65, 508 S.E.2d at 31.  The court further observed that in *Lowry*, it "held the defendant

was entitled to a charge on voluntary manslaughter [when] the defendant and victim were in a heated argument and 'the [victim] was about to initiate a physical encounter' when the shooting occurred." *Id.* at 65-66, 508 S.E.2d at 31. The court then concluded, "Here, [the defendant] and the victim had 'had words' and were engaged in a fight at the time the shooting occurred. Under *Lowry*, it is patent [the defendant] was entitled to a voluntary manslaughter charge." *Id.* at 66, 508 S.E.2d at 31.

In *State v. Knoten*, 347 S.C. 296, 299-300, 555 S.E.2d 391, 393 (2001), the defendant—convicted of murder in the deaths of the victim and the victim's niece—appealed the trial court's refusal to instruct the jury on voluntary manslaughter in connection with the victim's death. The defendant "gave a number of inconsistent statements to police, each more inculpatory than the last." *Id.* at 301, 555 S.E.2d 393-94. In his second signed statement, the defendant stated that he and the victim had consensual sex. *Id.* at 301, 555 S.E.2d 394. He claimed that, afterwards, the victim became agitated, armed herself with a knife, threatened the defendant, cut him on his leg, and chased him out of the apartment. *Id.* The defendant then retrieved a foot-long steel bar from the trunk of his car and reentered the apartment. *Id.* The victim "cut him again, and he hit her over the head with the metal bar," causing the victim to collapse. *Id.* Our supreme court held, "Viewing the evidence in the light most favorable to [the defendant], a charge of voluntary manslaughter was warranted here." *Id.* at 303, 555 S.E.2d 395. The court agreed with the defendant's argument that, because there was evidence the victim cut the defendant before he struck her with the pipe, the trial court should have instructed the jury on voluntary manslaughter, in particular noting in the defendant's second statement he claimed the victim cut him twice; that after the first cut he was chased out of the apartment and retrieved a metal pipe from his car; and he reentered the apartment and killed the victim after she cut him again. *Id.* at 305, 555 S.E.2d 396. Because there was evidence to support a conviction for the lesser-included offense of voluntary manslaughter, the court reversed the defendant's conviction in the slaying of the victim. *Id.* at 309, 555 S.E.2d at 398.

In *State v. Cole*, 338 S.C. 97, 102, 525 S.E.2d 511, 513 (2000), our supreme court found the trial court did not err in refusing to instruct the jury on voluntary manslaughter, determining there was no evidence of sudden heat of passion or sufficient legal provocation. There, the victim's friend attacked the defendant's friend, resulting in the defendant intervening to fight the victim's friend, and the victim then breaking up the fight. *Id.* at 99-100, 525 S.E.2d at 512. However, the victim's friend continued to behave hostilely, threatened the defendant's brother, overturned the defendant's stereo as he walked out, and promised to return. *Id.* at

100, 525 S.E.2d at 512. Once the victim and his friend went out the front door of the defendant's apartment, the defendant went out his back door; went next door to his mother's apartment where he retrieved a gun; and went out his mother's front door and stood in his front yard, where he claimed he heard shots being fired. *Id.* The defendant fired his gun, killing the victim. *Id.* The defendant claimed "he fired toward the ground, but the cause of the victim's death was determined to be a gunshot wound to the chest." *Id.* The shooting occurred three to five minutes after the victim and the victim's friend left the defendant's apartment. *Id.* The defendant stated he fired the gun because he was scared they might be coming back, he was scared they might come into his house and kill or hurt him and his brother, and he did not know what to do and "was scared." *Id.* "[The defendant] testified that he did not intend to shoot the victim, he was just scared and wanted to frighten [the victim's friend] and the victim away." *Id.* Viewing the evidence in the light most favorable to the defendant, the court noted that the victim's friend assaulted the defendant's friend and stole his jewelry; the defendant twice fought briefly with the victim's friend and was pulled off the victim's friend by the victim; and the victim's friend pushed over the defendant's stereo, after which the victim and his friend left the defendant's apartment. *Id.* at 102, 525 S.E.2d at 513. The court found these facts did not constitute sufficient legal provocation for voluntary manslaughter and, further, "there was no evidence presented that [the defendant] was overcome by a sudden heat of passion as would produce an 'uncontrollable impulse to do violence.'" *Id.* On the contrary, the court found that "by [the defendant's] own testimony, he shot at the men to scare them away," and the defendant's "testimony appear[ed] designed to support a charge of self[-]defense, not heat of passion." *Id.* Additionally, the court determined, "[e]ven if [the defendant] had been in the heat of passion during the confrontation in his apartment, three to five minutes had passed in which he had time to go to his mother's apartment and find his gun," and that "[f]ar from passion, these actions indicate 'cool reflection.'" *Id.*

In *State v. Childers*, 373 S.C. 367, 370, 645 S.E.2d 233, 234 (2007), the defendant became upset when the victim, his former girlfriend, refused to leave her mother's house to talk to the defendant. Later that night, the defendant saw the victim, the victim's sister, and the sister's ex-husband at a turkey shoot, where a confrontation ensued. *Id.* Evidence was presented that in the following early morning hours the victim, her sister, and the sister's ex-husband were standing in the victim's mother's yard talking after the turkey shoot when the defendant "suddenly appeared in the yard and shot the victim twice, at close range, in the head." *Id.* The defendant testified, however, that after the turkey shoot, he decided to walk from a friend's home to the victim's mother's home to talk to the victim. *Id.* at 370, 645 S.E.2d at 234-35. He claimed he carried a loaded gun during the walk to protect himself

from stray dogs and, as he approached the group standing in the yard, the sister's ex-husband shot at him first. *Id.* at 370, 645 S.E.2d at 235. The defendant stated that "[h]e returned fire, and in doing so, he shot the victim." *Id.* The defendant also testified "he did not visit the victim that night with the intention of shooting anyone, but he fired because he was fired upon." *Id.* at 370-71, 645 S.E.2d at 235. The majority of the court found the trial court did not err in failing to give a jury charge on voluntary manslaughter. *Id.* at 372, 645 S.E.2d at 235-36. Two of the justices determined this court erred in concluding the defendant was entitled to a voluntary manslaughter charge based on the fact that, although the victim did not provoke the defendant, the provocation by the sister's ex-husband could be transferred to the victim under the doctrine of transferred intent. *Id.* at 373-74, 645 S.E.2d at 236. They concluded, "[The defendant's] testimony does not support the contention that the killing was in the sudden heat of passion upon sufficient legal provocation by the victim because, contrary to the Court of Appeals' decision, the overt act that produces the sudden heat of passion must be made by the victim." *Id.* One of the justices concurred in result in a separate opinion, finding the defendant's own factual scenario "is completely void of any evidence remotely supporting a charge of voluntary manslaughter," because "[v]oluntary manslaughter, by definition, requires a criminal intent to do harm to another," and "according to the defendant's story, he had no criminal intent whatsoever." *Id.* at 375, 645 S.E.2d at 237 (Toal, C.J., concurring). Finally, two justices dissented from the majority on this issue, disagreeing with the State's contention that the defendant failed to present evidence that he was "inflamed by passion" when he returned fire and noting "the jury could have found the 'heat of passion' in [the defendant's] testimony that he fired back because he was scared and feared he would be shot at again." *Id.* at 378, 645 S.E.2d at 238 (Pleicones, J., dissenting; Moore, J., concurring in dissent).

In *Starnes*, 388 S.C. at 594-95, 698 S.E.2d at 607, the defendant and the two victims, Bill and Jared, were at the defendant's home when defendant shot the victims. Prior to the shooting, the defendant, Bill, and Jared had been at the defendant's restaurant, eventually leaving to go to a local bar. *Id.* at 593, 594, 698 S.E.2d at 606, 607. There was evidence presented that, while at the bar, Bill physically attacked the defendant in the bathroom. *Id.* at 594-95, 698 S.E.2d at 606-07. Later, after the three men left the bar, Bill told the defendant to take them to Jody Fogle's house to get drugs. *Id.* However, the defendant instead dropped Bill and Jared off at his house, picked up Jody, and brought Jody back to his house. *Id.* at 595, 698 S.E.2d at 607. The defendant testified as follows: he heard Jared cussing and saw him pointing a gun at Jody; he ran into the bedroom and retrieved his gun; as he exited the bedroom, Bill said "whoa" and pointed a gun at him; and

he shot Bill and then he turned and shot Jared. *Id.* He further stated, "I was scared and I was frightened. When Jared pulled the gun on Jody, it scared me." *Id.* at 599, 698 S.E.2d at 609. On appeal, the court acknowledged "[w]hile this testimony is evidence that [the defendant] was in fear, there is no evidence [the defendant] was out of control as a result of his fear or was acting under an uncontrollable impulse to do violence," and determined "[t]he only evidence in the record [was] that [the defendant] deliberately and intentionally shot Jared and Bill and that he either shot the men with malice aforethought or in self-defense." *Id.* Accordingly, the court concluded there was no evidence of sudden heat of passion upon sufficient legal provocation and, therefore, upheld the trial court's refusal to charge the jury on voluntary manslaughter. *Id.* at 599-600, 698 S.E.2d at 609.

In *Cook v. State*, 415 S.C. 551, 553-54, 784 S.E.2d 665, 666 (2015), the defendant and the victim, who lived in the same apartment complex, exchanged words via text message one afternoon. A couple of hours later, when the defendant, his girlfriend, and his cousin returned to the apartment complex, they found the victim sitting outside on the porch. *Id.* The victim "made a series of threatening comments directed at [the defendant] echoing similar sentiments from the text messages he sent earlier that day." *Id.* at 554, 784 S.E.2d at 666. Though "[the defendant] admitted [the v]ictim's last comment was 'enough to really strike [him] in [his] heart,' [the defendant] continued up the stairs without saying anything to [the v]ictim." *Id.* (third and fourth alterations in original). After eating some watermelon inside his apartment, the defendant "placed the watermelon rinds inside a plastic bag, grabbed his gun from under the couch, and went downstairs to discard the bag." *Id.* Once downstairs, the defendant "did not have a chance to get to the dumpster because [the v]ictim was approaching him, grimacing and threatening to shoot him in 'broad daylight.'" *Id.* The defendant stated that the victim "had one of his hands in his back pocket, acting as if he had a gun and was going to pull it out and shoot [the defendant] at any moment." *Id.* At the same time, the victim's nephew was approaching the defendant from the opposite direction "as if he was about to 'jump' him," and the defendant and the victim again exchanged words. *Id.* The defendant said "he tried to keep walking down the sidewalk, but [the v]ictim kept cutting him off," and the victim continued to approach him "huffing, grimacing, and threatening to kill him." *Id.* at 555, 784 S.E.2d at 667. The defendant said, "'the dude was coming up' and 'before I knew it, I fired a shot.'" *Id.* The defendant then fired a second shot and ran. *Id.* Both shots struck the victim in the face. *Id.* The defendant testified he fired the second shot "to make sure he was gone." *Id.* The defendant explained in his oral statement: "'I was terrified.' 'I didn't even sit there for a second. As soon as I saw him reaching I just shot.' 'I wasn't taking any chances.' 'It was either me or him,

man, it really was.'" *Id.* The victim's nephew testified concerning the events, stating he observed the victim get up and walk over to the defendant, that "from there on they were just talking real softly," and he "could hardly tell it was an argument." *Id.* The defendant then "stepped back, pulled out a gun and shot [the v]ictim." *Id.* The defendant "then walked over [the v]ictim, did some kind of gesture, shot [the v]ictim again, and ran." *Id.* The victim's girlfriend testified that once the defendant came downstairs, she saw the victim approach the defendant and say "keep my name out of all this mess y'all got going on out here. I don't have nothing to do with that." *Id.* According to her, "[t]he next thing she heard was a gunshot," and "after seeing [the v]ictim fall to the ground, . . . she saw [the defendant] walk over [the v]ictim and shoot him again." *Id.*

Cook filed a petition for post-conviction relief, which was denied. *Id.* at 556, 784 S.E.2d at 667. Our supreme court subsequently granted Cook a direct appeal on the issue of whether "the trial court erred in charging the jury with the lesser-included offense of voluntary manslaughter because there was no evidence that he was acting in the sudden heat of passion." *Id.* Our supreme court agreed the trial court committed error, stating as follows:

> We do not believe the facts of this case support a finding that [the defendant] shot [the v]ictim in the sudden heat of passion. Here, [the defendant] stated he tried to walk away from [the v]ictim, but [the v]ictim kept cutting him off. The fact that [the defendant] was trying to walk away from the conflict does not suggest [the defendant] was incapable of cooling off. In addition, [the victim's nephew] testified that [the defendant] and [the v]ictim were talking softly and that he could hardly tell they were arguing. This too does not suggest that [the defendant] was acting under an uncontrollable impulse to do violence as surely if one was so enraged to kill, one would not be talking softly with the victim right before the act. Further, at no point during [the defendant's] statement does he indicate he lacked control over his actions. Accordingly, we believe the facts of this case suggest [the defendant] shot [the v]ictim either with malice or in self-defense.

*Id.* at 557, 784 S.E.2d at 668.

In *Niles*, conflicting evidence was presented regarding the shooting death of the victim when the defendant, his fiancé, and Ervin Moore met the victim to purchase marijuana. 412 S.C. at 518, 772 S.E.2d at 878. The defendant and Moore testified at trial, and their testimony was at odds as to whose idea it was to rob the victim and whether the victim or the defendant fired the first shot. *Id.* Moore testified the defendant decided to rob the victim and Moore's role in the robbery was to identify the marijuana. *Id.* at 519, 772 S.E.2d at 878-79. Moore stated that he joined the victim in the victim's vehicle, and the victim produced the marijuana for his inspection. *Id.* at 519, 772 S.E.2d at 879. As Moore returned to their vehicle, the defendant had already exited that vehicle and Moore told the defendant the victim had the drugs. *Id.* The defendant leaned into the passenger-side door of the victim's car and spoke to the victim. *Id.* Moore heard two shots, saw the defendant leap into the back seat of his own car, and heard the victim fire a weapon in response. *Id.* The defendant and the victim shot back and forth multiple times, and the defendant had the drugs that he had stolen from the victim. *Id.* at 519-20, 772 S.E.2d at 879. The defendant, on the other hand, testified Moore acted alone, with Moore going over to the victim's vehicle to purchase the drugs. *Id.* at 520, 772 S.E.2d at 879. He then saw Moore and the victim fighting in the victim's vehicle and realized Moore was robbing the victim. *Id.* According to the defendant, Moore exited the victim's vehicle with the stolen drugs and dove back into his car, the victim drew a gun and shot at them, and the defendant grabbed his gun and returned fire. *Id.* The defendant maintained he was concerned with stopping the shooter and for his fiancé's safety, testifying:

> So, while he was shooting in the car . . . I grabbed my pistol and that's when I shot two times. My eyes were closed. I wasn't even looking. I shot two times. I went pow, pow. I wasn't trying to hit nobody . . . I was just trying to get him to stop shooting. That's all I was trying to do. I didn't know if my fiancé got shot or nothing. That's the first thing that came to my head, you know.

*Id.* (omissions in original).

A majority of our supreme court "agree[d] with the State that there was no evidence that [the defendant] acted within a sudden heat of passion upon sufficient legal provocation, and therefore the trial court did not err in refusing to instruct the jury on the lesser-included offense of voluntary manslaughter." *Id.* at 521-22, 772 S.E.2d at 880. It found the defendant's own testimony failed to "establish that he was overtaken by a sudden heat of passion such that he had an *uncontrollable*

*impulse to do violence*" but, rather, the defendant had testified "that he did not want to hurt the victim; that he shot with his eyes closed; that he was merely attempting to stop the victim from shooting; and that when he shot his gun, he was thinking of [his fiancé] rather than of perpetrating violence upon the victim." *Id.* at 522-23, 772 S.E.2d at 880. The majority further concluded, "Because [the defendant], by his own testimony, lacked the intent to harm the victim, we cannot see how a voluntary manslaughter charge would have been appropriate under these facts." *Id.* at 523, 772 S.E.2d at 881. The dissent, on the other hand, would have found "the unprovoked shooting by [the victim] amounted to evidence sufficient for a jury to infer that there was legal provocation," and "[the defendant's] testimony that he immediately returned fire out of fear for himself and his fiancé[] provided evidence from which a jury could find that [the defendant] was acting pursuant to an uncontrollable impulse to do violence." *Id.* at 525, 772 S.E.2d at 882 (Pleicones, J., dissenting).

Finally, neither party cites this court's 2017 opinion in *State v. Oates*, 421 S.C. 1, 803 S.E.2d 911 (Ct. App. 2017). There, the defendant—who was convicted of voluntary manslaughter—challenged the trial court's decision to give a voluntary manslaughter instruction to the jury, asserting there was no evidence of sudden heat of passion. *Id.* at 7, 803 S.E.2d at 915. The facts of that case reveal as follows.

The defendant, who had been hired by a homeowner's association to tow illegally parked cars, placed a disabling device, or "boot," on the victim's minivan. *Id.* at 8, 803 S.E.2d at 915. The victim, his brother, and his brother's neighbor approached the defendant requesting he refrain from towing the minivan. *Id.* at 7-8, 803 S.E.2d at 915. According to the defendant, he felt intimidated by the three men. *Id.* at 8, 803 S.E.2d at 915. The defendant told investigators the men were "running 'a little abruptly' and were 'hooting' and 'hollering.'" *Id.* The defendant further stated both the victim and his brother "jumped up on the truck's running board and started talking to him through the window and [the v]ictim told [the neighbor], 'Go get my shotgun.'" *Id.* The brother instructed the defendant to take the boot off the vehicle, and the defendant told him he would call his office and they would "work this out." *Id.* The defendant "then heard 'a round being chambered' as well as [the v]ictim stating, 'You're [going to] take this off right now and I'm leaving,' to which [the defendant] responded, '[T]hat's fine.'" *Id.* (second and fourth alteration in original). The defendant stated he stalled to regain his composure. *Id.* The brother verified that the victim "pulled a gun out of his pants, ratcheted the gun, and stated, 'Nobody's going to take my car,'" and that the defendant "seemed very nervous." *Id.* The defendant indicated the brother

grabbed his keys and the lock tool to release the boot, and the victim asked the defendant if he had any paperwork on his minivan, indicating "he did not want law enforcement to 'come look' for him." *Id.* at 9, 803 S.E.2d at 915. The defendant took the opportunity to open his glove box and remove his gun while he showed the victim his ledger. *Id.* at 9, 803 S.E.2d at 916. The defendant indicated he heard the brother yell something in Spanish, and the victim looked at the defendant and told him to "[c]ome get this s**t off now." *Id.* The defendant then described as follows: The victim unlocked his truck door and opened it; as the victim stepped off the running board, the defendant observed him reach back and grab his pistol with his right hand; as the defendant was exiting the truck, the victim was "already in motion and he's in draw;" and the defendant reacted. *Id.* 9-10, 803 S.E.2d at 916. He testified:

> I [exited] straight out my door stepping off of the metal running boards . . . and I was [exiting] out, and I looked and my line of sight was through him straight down to the ground. It's now or never. He's already in motion and he's in draw. Whether he's drawing it to intimidate me, to keep me to go do what he wants me to do, or if he knew I didn't have any information on his vehicle and . . . ah, bye, bye, Preston . . . regardless, he was in motion, he was in draw and I reacted.

*Id.* at 10, 803 S.E.2d at 916 (alterations and omissions in original). The defendant stated he "remember[ed] the very first shot," and the victim was "still a threat to [him]," so he "discharged again." *Id.* The defendant did not know how many times he pulled the trigger, but remembered two shots. *Id.*

Other witness's accounts conflicted with the defendant's. *Id.* According to the brother, the victim put his gun in his waistband after the brother told him to put it away, and the victim never pulled out his gun again. *Id.* The brother further "expressly stated there was 'no arguing, . . . no fighting, . . . no bad words' and [the v]ictim never talked to, threatened, or 'attempt[ed] to do anything to [the defendant].'" *Id.* (second alteration and omissions in original). The victim's widow also testified that the victim was directing traffic around the minivan and tow truck when the defendant shot the victim. *Id.* at 10-11, 803 S.E.2d at 916. Further, "[t]he testimony of [the v]ictim's widow, [the brother's] wife, and [the] neighbors, as well as a video from [one of the neighbor's] home surveillance camera, indicated [the v]ictim was walking or running away from [the defendant] when [the

defendant] began shooting him." *Id.* at 11, 803 S.E.2d at 916. An autopsy revealed the victim had been shot six times. *Id.* at 11, 803 S.E.2d at 917.

This court disagreed with the defendant's assertion that the trial court erred in "charging the jury on the lesser-included offense of voluntary manslaughter because there was no evidence of the element of 'sudden heat of passion,' i.e., that [the defendant] was acting under an uncontrollable impulse to do violence and was incapable of cool reflection as a result of fear." *Id.* at 23, 803 S.E.2d at 923. After analyzing our supreme court's decisions in *Cook* and *Starnes*, this court held:

> In the present case . . . the jury could have reasonably inferred from the evidence that when [the defendant] shot [the v]ictim six times, he was acting under "an uncontrollable impulse to do violence" even if the jury could have drawn an equally reasonable inference that [the defendant] acted in a "deliberate, controlled manner." Admittedly, several witness accounts of the entire incident are comparable to witness accounts of the defendant and the victim "talking softly" in *Cook*. Further, [the defendant] told police that before he fired the fatal shots, he was in "conservation mode." When asked how many shots he fired, [the defendant] initially stated he remembered two shots and then compared his reaction during the incident to his reaction during a prior incident: "But I don't know when I . . . I know . . . I knew the first time on Hilton Head, I remember I emptied it . . . Well, that . . . that was a panic fire . . . the first time. *This time, I had a little bit more composure.*" (emphasis added). [The defendant] also explained to police that the numerous shots fired at [the v]ictim were his attempt to disable [the v]ictim from killing [the defendant] and that he kept shooting until he saw [the v]ictim's gun slide across the road beneath him. The jury could have reasonably inferred from all of this evidence that [the defendant] was acting in a "deliberate, controlled manner."
>
> However, unlike the lack of *any* evidence of sudden heat of passion in *Cook* and *Starnes*, there is some evidence in the present case from which the jury could have

reasonably inferred that [the defendant] was "incapable of cool reflection" and was acting under an "uncontrollable impulse to do violence." First, neither *Cook* nor *Starnes* involved six gunshots to the same victim as does the present case. Further, one of [the brother's] neighbors . . . was sitting in her family's car in their driveway after returning from a restaurant when she heard "a lot of people outside yelling." She testified she saw "one of the guys" stepping onto the truck's "side rail" and "they were just getting very argumentative and just going back and forth." Her husband . . . testified that as he was going into his house to obtain some personal belongings and returning to the car, he "could hear a dispute" and when he was back in the car, he heard gunshots fired in "rapid succession."

*Id*. at 25-27, 803 S.E.2d at 924-25 (second through sixth omissions in original) (citations omitted). This court further noted the evidence from the brother that the defendant was very nervous before the victim ratcheted his gun, and the defendant's statement that when the victim asked him about the paperwork, that was when he "got really scared." *Id.* at 27, 803 S.E.2d at 925. This court concluded: "The jury could have reasonably inferred from all of this evidence that when [the defendant] shot [the v]ictim six times, he was 'incapable of cool reflection' and was acting under an 'uncontrollable impulse to do violence' such that there was sufficient evidence of [the defendant's] sudden heat of passion." *Id.* at 28, 803 S.E.2d at 925-26.

## C. Analysis

Viewing the evidence in a light most favorable to Payne, we find the trial court erred in refusing Payne's request to charge the lesser-included offense of voluntary manslaughter. *See Niles*, 412 S.C. at 522, 772 S.E.2d at 880 ("When determining whether the evidence requires a charge on voluntary manslaughter, the court must view the facts in the light most favorable to the defendant."); *Starnes*, 388 S.C. at 596, 698 S.E.2d at 608 ("To warrant the court eliminating the charge of manslaughter, there must be no evidence whatsoever tending to reduce the crime from murder to manslaughter."); *id.* ("If there is *any evidence* from which it could be inferred the lesser, rather than the greater, offense was committed, the defendant is entitled to such charge." (emphasis added)); *id.* at 597, 698 S.E.2d at 608

("Whether a voluntary manslaughter charge is warranted turns on the facts. If the facts disclose any basis for the charge, the charge must be given.").

"Voluntary manslaughter is the intentional and unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation." *Smith*, 391 S.C. at 412-13, 706 S.E.2d at 14. We acknowledge that, under Payne's testimony alone, the evidence may be insufficient to support a jury charge of voluntary manslaughter. However, we are not limited to considering a defendant's *trial testimony* on the matter. *See Knoten*, 347 S.C. at 305-09, 555 S.E.2d at 396- 98 (noting, in spite of the State's contention the defendant was not entitled to a voluntary manslaughter charge because he recanted his confession at trial, one of defendant's statements to police that was introduced at trial supported such).

The State acknowledges there is arguably sufficient evidence of legal provocation from Tyeisha's testimony, but challenges the sufficiency of evidence of sudden heat of passion. We agree that there is clearly evidence of legal provocation, as both Tyeisha and Payne testified Victim fired his gun at Payne first during their encounter near Payne's home. *See Smith*, 391 S.C. at 413, 706 S.E.2d at 15 ("[A]n overt, threatening act or physical encounter *may* constitute sufficient legal provocation."). The question thus becomes whether there is *any* evidence Payne acted in "sudden heat of passion" when he shot Victim. *See id.* ("For a defendant to be entitled to a voluntary manslaughter charge, there must be evidence of both sufficient legal provocation and heat of passion at the time of the killing."); *id.* ("To warrant the court in eliminating the offense of manslaughter it should clearly appear that there is *no evidence whatsoever* tending to reduce the crime from murder to manslaughter." (emphasis added) (quoting *Pittman*, 373 S.C. at 572, 647 S.E.2d at 168)). "In determining whether the act which caused death was impelled by heat of passion or by malice, all the surrounding circumstances and conditions are to be taken into consideration, including previous relations and conditions connected with the tragedy, as well as those existing at the time of the killing." *Id.*

Admittedly, there was testimony that the witnesses did not know what Payne and Victim argued about, Tyeisha described it as "[not] necessarily arguing, arguing, but . . . just having words back and forth," and Payne himself testified he could not recall what he and Victim argued about at Hartzog's trailer or if there was even an argument during the second encounter. Further, Payne testified, "When you're backing up not looking, you can't see who you're shooting at or what you're shooting, you just know you're shooting to get someone away from you or anything that's firing at you," and Payne agreed he was "backing up toward the house" and was not "paying attention where [he was] shooting." However, as in

*Oates*, though there are some factual similarities with *Cook* and *Starnes*, we find "unlike the lack of *any* evidence of sudden heat of passion in *Cook* and *Starnes*, there is some evidence in the present case from which the jury could have reasonably inferred that [Payne] was 'incapable of cool reflection' and was acting under an 'uncontrollable impulse to do violence.'" *Oates*, 421 S.C. at 27, 803 S.E.2d at 925 (quoting *Starnes*, 388 S.C. at 598, 698 S.E.2d at 609).

In *Lowry*, our supreme court determined the defendant was entitled to a charge on voluntary manslaughter noting, "testimony which, if believed, tend[ed] to show that the [victim] and [the defendant] were in a heated argument and that the [victim] was about to initiate a physical encounter when the shooting occurred." 315 S.C. at 399, 434 S.E.2d at 274. In the case at hand, evidence was presented that: Payne and Victim engaged in a verbal argument and "exchanged words" outside Hartzog's trailer; Tyeisha described hearing arguing and stated that when she walked up to the porch to see what was happening, Payne and Victim were still interacting, "going back and forth," and they were "having words back and forth"; the exchange was such that the women at Hartzog's trailer told Victim to leave and told Payne not to follow him; Victim went to the top of the road and stayed there; Payne drove across the yard to his home as Victim walked on the street in the direction of Payne's home, at which point there was a second encounter between Payne and Victim; Victim walked toward Payne as he was exiting his car; Tyeisha stated the two "started having words again because you could tell that they [were] . . . talking back and forth"; Alicia testified that when Payne encountered Victim again up the road, he and Victim had another verbal dispute, Payne got out of his car, they were still arguing, Payne turned to go back to his car and she "[was] not sure if something was said or what happened, but . . . when he turned back around to face [Victim], [Payne] began shooting at him" and when Payne turned to go back toward his car, he never made it to the car, but turned back around and "just started firing" at Victim; Tyeisha testified Payne tried to punch Victim and Victim then pulled out a handgun; Payne then "had . . . his hands. . . like 'I guess you don't want to fight'" and "they [were] still . . . kind of having words; Payne turned away from Victim, going back in the direction of his house; Victim trailed behind Payne, and they were still having words and arguing; Payne turned around facing Victim as they were still having words and then Victim "started firing"; Payne's response to Victim firing at him was to fire back, and Payne "started firing . . . right after that, it was consecutive"; Tyeisha could tell Victim fired first because she "could see it coming from . . . his direction"; Payne was "afraid for [his] life" during this time; although Victim turned around and ran away, Payne kept shooting; and Victim was shot four times.

As noted,

> A person may act in a deliberate, controlled manner, notwithstanding the fact that he is afraid or in fear. Conversely, a person can be acting under an uncontrollable impulse to do violence and be incapable of cool reflection as a result of fear. The latter situation constitutes sudden heat of passion, but the former does not.

*Starnes*, 388 S.C. at 599, 698 S.E.2d at 609. Like *Oates*, we acknowledge there was evidence presented from which the jury could have reasonably inferred that Payne was acting in a "deliberate, controlled manner," however, there was also evidence presented from which the jury could have reasonably inferred Payne was acting under an "uncontrollable impulse to do violence." 421 S.C. at 26-27, 803 S.E.2d at 924-25. Specifically, there was evidence presented that Payne and Victim were in an argument outside Hartzog's trailer that was heated enough for the women to instruct Victim to leave and Payne not to follow Victim when Victim walked away; when Payne drove the very short distance to his home and exited his vehicle, Victim approached him; an argument ensued between the two which was of enough intensity for both Tyeisha and Alicia to observe such was occurring from a significant distance away; the argument was such that Payne tried to punch Victim; Payne turned away from Victim, walking toward his home and Victim followed him, continuing the argument; Victim fired his gun at Payne first, causing Payne to return fire and shoot Victim four times, even though Victim was running away as Payne continued to fire at him; and Payne testified he was "afraid for [his] life." Additionally, Alicia testified "I'm not sure if something was said or what happened, but he — — when [Payne] turned back around to face [Victim], he began shooting at him," and when Payne turned to go back toward his car, he turned back around and "just started firing" at Victim. Accordingly, viewing the evidence in a light most favorable to Payne, there is evidence from which the jury could have reasonably inferred the lesser, rather than the greater, offense was committed such that the trial court erred in refusing Payne's request to charge voluntary manslaughter. *See Starnes*, 388 S.C. at 596, 698 S.E.2d at 608 ("If there is *any evidence* from which it could be inferred the lesser, rather than the greater, offense was committed, the defendant is entitled to such charge." (emphasis added)).

## II. Failure to Charge Continuing To Shoot

We need not address the failure of the trial court to charge Payne's requested "continuing to shoot" language because the prior issue is dispositive, and whether the matter may arise on retrial will be dependent on evidence admitted, arguments raised, and whether the essence of any appropriate language is contained in the trial court's charge. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not address remaining issues on appeal when its determination of a prior issue is dispositive); *State v. Mekler*, 379 S.C. 12, 17, 664 S.E.2d 477, 479 (2008) (affirming this court's decision reversing defendant's conviction and granting a new trial, but finding it unnecessary to address another issue, noting whether the issue would arise on retrial and its resolution would depend upon the evidence and testimony then presented).

## CONCLUSION

For the foregoing reasons, we reverse Payne's conviction and remand for a new trial.

**REVERSED AND REMANDED.**

**WILLIAMS and GEATHERS, JJ., concur.**